UNITED STATES, Appellee

v.

CLARICE B. COVERT (A person accompanying the
Armed Forces of the United States without
the continental limits of the United
States and its possessions),
Appellant

6 USCMA 48, 19 CMR 174

No. 4974

Decided June 24, 1955

Frederick Bernays Wiener, Esq., and Col A. W. Tolen, USAF, for Appellant.

Lt Col Emanuel Lewis, USAF, Lt Col Harold Anderson, USAF, Maj William G. Carrow, III, USAF, and Capt Giles J. McCarthy, USAF, for Appellee.

## Opinion of the Court

Paul W. Brosman, Judge:

This case involves a further problem of mental responsibility. The accused woman was tried in England by general court-martial for the premeditated murder of her husband, in violation of the Uniform Code of Military Justice, Article 118, 50 USC § 712. She was found guilty under the charge and its specification and sentenced to life imprisonment. The convening authority approved both the findings and sentence—and a board of review in the office of The Judge Advocate General, United States Air Force, with one member dissenting, has affirmed. The case is before us on both the accused's petition for review and a certificate from The Judge Advocate General. The questions certified are as follows:

"a. Upon the state of the evidence in this case bearing upon the issue of sanity, was the Law Officer under a duty to provide the court-martial with further specific instruction as to the possible effect of such evidence upon the mental capacity of the accused to entertain premeditation?

"b. If the answer to the preceding question is in the affirmative, may the error be purged by affirming so much of the approved findings as find the accused guilty of unpremeditated murder and thereafter reconsidering the approved sentence?"

The grant of review by the Court authorized argument on the following points, which we phrase generally:

(1) Is the evidence legally sufficient to establish, beyond a reasonable doubt, that the accused was mentally responsible for the crime charged?

(2) Did the limitations on certain

**49**

expert witnesses testifying on irresistible impulse, which are provided in AFM 160–42, constitute an instance of improper command influence?

(3) Did the law officer err in restricting defense counsel in his cross-examination of the Government's expert witnesses?

(4) Did the law officer err in instructing that the "policeman-at-the-elbow test" was a proper method for determining whether the accused was impelled to commit the crime by an irresistible impulse?

## II

We accept defense counsel's concession that no question respecting the cause or agency of death is involved in the present appeal. It is properly admitted by them that the evidence against the accused on this issue is undisputed—and because of this no more than a brief summary of the facts and circumstances immediately surrounding the homicide will be related. On March 11, 1953, during an interview with Mrs. Covert, Captain Ivan C. Heisler, a psychiatrist of the 5th Hospital Group, obtained information which caused him to believe that during the previous night a killing had occurred at the quarters occupied by her husband and his family. Acting on this knowledge, he obtained a key to her and her husband's home and—after leaving his patient in the care of a nurse—went to their quarters, accompanied by the base surgeon, and an air police officer. On arrival, they proceeded to the upstairs bedrooms, and saw in one of them a cot on which a number of blankets had been arranged. After removing these, they discovered the dead body of the deceased, the accused's husband. A pillow covered his head, and there was much blood on the bed clothing. It was quite obvious that he had been dead for some time, and a subsequent examination revealed that death had been caused by blows on his head and face which had been inflicted by a blunt instrument. A hand ax, which was shown later to bear stains of human blood, was found near the fireplace in the first floor front room of

the quarters, and a suit of bloodstained pajamas was subsequently located hidden in a laundry tub on the premises. In pretrial statements, made by the accused to various Air Force medical and investigative people, she admitted that she had committed the offense charged sometime during the night of March 10–11, 1953.

The evidence presented with respect to the accused's mental responsibility was extensive, and included her life history and a detailed psychiatric exposition of her mental condition at the time of the homicide. According to this account, the accused had been born prematurely in Augusta, Georgia, on December 21, 1920, as a child of her mother's second marriage. Her childhood was unhappy, and was marred by frequent quarrels between her parents and by cruel treatment directed by the father against both herself and her mother. She felt unwanted, alone, afraid, without parental love. The accused was reclusive during high school days and markedly hesitant to invite friends to her home—which she described as a dirty, broken down, three-bedroom house next door to a chicken yard and an alley. Her father she remembered as coldly indifferent, and so resentful of the fact that she had not been born a boy that—according to her mother's account—he had on one occasion gone so far as to attempt to toss her out of a window, and on another to choke her. In 1926 her father left their home, but subsequently returned. However, in 1932 he abandoned his family permanently. His distaste for the accused appears to have been characterized by the frequent presentation to her of gifts and toys designed for boys, and he was plagued by incessant financial difficulties occasioned by gambling.

After completing high school, the accused unwillingly left her home to begin nurses' training, since she continued to feel unwanted there. After meeting the deceased—then an infantry second lieutenant—in January 1943, she married him in March of the same year. Between May 1943, when he departed for overseas duty, and November 1945, when he returned to the

United States, her husband was frequently in financial trouble—and at one time she was required to find $600.00 to free him from custody. On resuming civilian life, he became an unqualified wastrel, took to drink, and spent most of his wife's accumulated savings of more than $5000.00 before re-entering the military establishment in 1946 as an Air Force master sergeant.

New financial problems ensued, and by November 11, 1947, when the pair's first child was born, their savings had been exhausted—and an insurance policy had been converted to take care of necessary medical expenses and hospitalization. During the accused's pregnancy, Sergeant Covert had covered a $450.00 gambling loss with a worthless check. Conduct of this nature led to a separation—but the accused became nervous, sleepless, and less able to perform her daily tasks. A reconciliation was followed by the birth of a second child in September 1950.

In May 1951 the deceased was assigned to duty in England with the Seventh Air Division—and, after his wife's arrival four months later, they resided in London until July 1952. The destruction by fire of certain goods of hers which had been stored in the United States, the poor health of her younger son and his delay in learning to speak—together with the Sergeant's continued gambling—all served to keep the accused on tenterhooks. In December 1952, after the couple had been transferred to Upper Heyford, England, the accused was informed that she was about to inherit a sizeable sum of money—glad tidings from which, unfortunately, her present tragic situation later developed. The accused's preference for saving this windfall for their children's education and future welfare clashed sharply with her husband's desire to acquire a new automobile and tour the European continent—a difference of opinion which brought further worry to the accused. Indeed, she began to feel incapable of continuing her harassed life—especially as a possibility remained that she would be deprived entirely of the prospective legacy by the reappearance of her long-missing father, who might have been able to establish a claim to the fund superior to her own.

After, as well as before, the arrival of news concerning her probable inheritance, Sergeant Covert continued to display what appears to have been his established pattern of questionable conduct—which, as numerous witnesses portrayed it, involved poor judgment, childishness, gambling, financial irresponsibility, and—on at least one occasion—the public humiliation of his wife. Indeed, in many unpleasant ways he displayed ever greater similarity to the accused's vanished father. As identification of husband and father grew, the accused's depression increased. Having sought aid from a military medical facility, she was directed to consult with a Captain Cogar, an Army physician, who, on February 16, 1953—the date of her first visit—prescribed a mild sedative, and advised her to revisit him after three days. No indication of improvement was observed on her return—and, in view of a possible hypothyroid condition, she was referred to a hospital for a complete physical examination. However, hospitalization revealed no organic difficulty, and she was discharged, after having been furnished with a supply of sleeping tablets. On March 9, when Dr. Cogar next saw the accused, she appeared emotionally disturbed, and stated that she felt as though "something were about to let go," and that "if she did not obtain relief from her nervous condition she was afraid something serious might happen." Concluding that the accused was thoroughly upset, Cogar again prescribed sedation, and arranged for her an appointment with Captain Heisler, a psychiatrist stationed nearby.

This medical officer talked with her on the afternoon of March 10, 1953, for approximately one and one-half hours—a somewhat longer engagement than is normal for such a purpose, but one occasioned by the accused's obvious distress and agitation. Staring almost constantly at the floor, Mrs. Covert engaged in no spontaneous activity, save that she chain-smoked cigarettes. She related her symptoms, her anxiety feelings and sleeplessness, as well as other matters which had caused her

**51**

mental disturbance over the years. Heisler considered immediate hospitalization, but decided against such a disposition at the time in view of crowded infirmary conditions, limited medical facilities, and what he then deemed an absence of urgency.

Also on March 10, the accused visited the home of a friend and neighbor, a Mrs. Scamordella, and at the time appeared normal and neither upset nor nervous—even remarking that she felt "pretty good." Mrs. Scamordella invited her to accompany the former to a bingo game that evening, but the invitation was declined. Shortly before 6:00 p.m., Sergeant Covert and the two children appeared at the Scamordella home, and soon thereafter the entire family returned to their own quarters—with the accused and her husband seeming to be in a happy mood and on good terms. After the evening meal at the Covert residence, the husband retired at his usual hour, apparently without argument between the two or other untoward episode. He did not rise again, for, while he lay sleeping, Mrs. Covert killed him with an undetermined number of ax blows. At the time she was clad in flannel pajamas which—being covered with blood—she placed in a washtub. In her testimony at the trial, the accused displayed a loss of detailed recollection regarding the events which transpired that evening, and could offer no reason for her act. After the homicide she covered the body, administered to herself a heavy dosage of drugs, and thereafter composed herself for sleep in the bed occupied by her dead husband—apparently with no expectation that she herself would ever awaken from slumber.

Between 1:30 and 2:00 p.m. the following day, Mrs. Covert and her children were seen walking across the lawn toward a nursery, where she left the children. She appeared pale, seemed to stagger, and experienced difficulty in locating the knob on the nursery door. Later she departed from her home for a two o'clock appointment with Captain Heisler. She wore slacks and a leather jacket; her hair was uncombed; she was otherwise dishevelled and seemed obviously distressed. Ar-

riving late for the medical appointment, she responded to the psychiatrist's question concerning the state of her health by commenting that it was "not so good"—and thereafter, with no sort of preface, stated in an unemotional and dull monotone, "I killed Eddie last night." After this and later remarks had precipitated the discovery of the Sergeant's body, Mrs. Covert was confined to the infirmary for the greater part of the afternoon and was interrogated to a limited extent.

Considering her condition as he observed it on March 11, 1953—together with information obtained from the previous day's interview and subsequently acquired data—the Captain concluded that the accused suffered from a psychotic depressive reaction at the time of the slaying. In short, he believed her to be a psychotic person who was unable to distinguish right from wrong, and to adhere to the right, at the time of the act charged. Among other factors, his opinion was fortified, he felt, by the comment of Mrs. Covert —an unreconstructed Southerner—to the effect that even the presence of General Sherman would not have prevented her from killing her spouse. This expert witness believed that, under any and all tests, including that presented by AFM 160–42, the accused was wholly irresponsible.

Relying on tests performed on the accused by him after the offense, one Captain Adelsohn, a clinical psychologist, supported Heisler's views. Dr. Adelsohn was reluctant to confine himself to what he described as the "black and white field" of psychiatry—since he preferred a more flexible approach to diagnosis—but he did consider that, at the time of the killing, Mrs. Covert suffered from a paraschizophrenic condition, and was a totally irresponsible psychotic whom neither policemen, nor the entire United States Army, would have deterred from the homicide. He termed "ridiculous" the findings of a sanity board consisting of three psychiatrists, Lieutenant Colonel Richard L. Martin, Captain James H. Graves, and Major Richard E. Troy.

Captain Graves had been the original

draftsman of the sanity board's report, although it had been rewritten extensively. In his opinion, Mrs. Covert on the night of the killing had suffered from a dissociative reaction, but this had not, in his opinion, reached psychotic proportions. However, as he pointed out: "In the case of Mrs. Covert, I think we can state very securely that she is not a character and behavior disorder." In further clarification of dissociative reaction he noted:

"... there is in psychiatry, and in the official nomenclature which we use—we have to use, in military psychiatry, which we practice—there is a designation which we would use for this sort of thing, which we call a disassociative reaction. It is a big word, but it just means, for a temporary period of time the personality is not functioning as a whole. The whole personality is not working."

With reference to the accused's ability to adhere to the right, the following colloquy occurred during direct examination of Captain Graves by trial counsel:

"Q. Do you feel that if a policeman were present, *or someone else were present,* she would have refrained from the act.
"A. Yes, I do." [Emphasis supplied.]

The passages from Captain Graves' testimony set out below are also pertinent to his approach to the "policeman at the elbow" test:

"... If there had been a policeman there, for instance, this could not have come about—I mean, she would have been jolted out of it. *If her children would have been there, I am sure she would have been jolted out of it.*

•     •     •     •     •

"After the crime, of course, she was in a sort of—she was in a depressive state, which would go along with being in the very difficult straits in which she found herself, but there has been no really fundamental change in her personality at the time of the crime or after. There was,

in my opinion, a temporary weakening of the power of her conscience, a weakening of her power to adhere to right and to know right from wrong and to act upon it, but it was not abrogated; it was not thrown aside completely; it was not completely inundated, let's say. She still possessed the capacity to adhere to the right and to know right from wrong, and if there had been some disturbing influence, like someone walking into the room or the children waking up, or something like that, that occurred at this time, I think that this disassociation that I speak about would not have produced the crime for which she is being tried." [Emphasis supplied.]

Captain Graves emphasized with respect to Mrs. Covert's condition:

*"But, according to the regulations that are set down for us . . ., I* have no choice but to say that this was a neurotic reaction. There was nothing psychotic about it, in my opinion, it was a temporary, partial brushing aside of the conscience. The personality was not disintegrated." [Emphasis supplied.]

However, it appears—according to Dr. Graves—that there were powerful emotional forces operating on Mrs. Covert which rendered her incapable of conceiving of and executing the crime in a premeditated way. The idea of the offense came to her in a flash, and was as rapidly executed. Therefore, this witness expressed to the court-martial definite doubt that the killing was premeditated. In his view, Mrs. Covert

"... felt very futile about the whole business, and she, I think, had formed some intent of suicide and the question of what might be done to her in this disassociative state I don't think was very strong in her mind. I just don't think that she was capable of thinking of it, you see."

Dr. Martin—also testifying for the Government—indicated that the accused could adhere to the right, although he believed that she was subject to an impairment of ability to do so

by reason of the dissociation of her personality at the time of the killing. Her dissociative reaction manifested a long-standing psychoneurotic disorder, and placed her in a twilight area near the borderline of psychosis. On the night of March 10, the question of the right and wrong of an act did not at all influence her behavior, since the unconscious personality had assumed control. Colonel Martin stated that there was no evidence of premeditation or prior consideration by the accused of the slaying before us.

Trial counsel directed the attention of this witness to the definitions of irresistible impulse contained in AFM 160–42, and reminded Dr. Martin that he was bound thereby in his testimony. Martin replied that, under the standards laid down by that Manual, entitled "Psychiatry in Military Law," he had concluded that the accused was mentally responsible in a criminal sense—although he commented to the effect that he knew nothing of the law other than that which was stated in this Manual. In his unsolicited post-trial affidavit submitted to the convening authority, he elucidated this position. There he mentioned that Mrs. Covert's acute dissociative reaction had resulted in

". . . a personality (ego) disorganization that permits the anxiety to overwhelm *and momentarily govern* the total individual and that this occurs with little or no participation on the part of the conscious personality." [Emphasis supplied.]

And he added that:

". . . In such cases as these, as is well known, a person may be brought out of an acute state of dissociative reaction by some shock as simple as being slapped in the face. In this connection, I believe that the reaction through which Mrs. Covert went on the night of 10 March was such that the appearance of *a civil authority* at her side would have been equivalent to the slap in the face and that she probably would not have carried out the alleged act. *The same probably would have been true if her children would have come into the room.* But none of these things

happened and she remained in a dissociated state until she had taken the sedatives and fallen to sleep." [Emphasis supplied.]

Major Troy's conclusion was that the accused was mentally responsible within the standards laid down in AFM 160–42, and that she would not have committed the act had there been a policeman at her side. Elaborating his views, he testified:

". . . On the night of the offense, this extreme tension and mixed-up feelings, depression, I feel, sort of came to a head, almost overwhelmingly, to the point that she, as many normal people feel in a shock, of a severe stress, that she worked—that she operated almost in an automatic or dazed manner. I think that her judgment, that her actions of that time, were carried on in this sort of dazed, automatic-like manner; that the ambivalence, the mixed feelings, the depression; that she wanted to give her children something, that her own life was, she felt, ruined; that she had nothing to gain; and that her husband stood in the way of anything she might give her children— she expressed the idea that she might take her own life, but if she did that the money—the children would fail heir to the husband, and that they again would be in the same boat.

"So I feel that it was in this dazed, impaired perhaps, state of mind that the offense was committed."

At one point Dr. Troy stressed the notion that it was possible for psychiatrists reasonably to disagree in diagnosis. And he appears to have been in disagreement with his colleagues respecting Mrs. Covert's capacity to premeditate the homicide, since he was the only expert witness who stated that she *could* premeditate. Interestingly enough, Major Troy had probably enjoyed less opportunity to observe the accused than the other medical witnesses who testified, but was the only one of the group who had been certified by the American Board of Neurology and Psychiatry—although all appear to have been well-versed in their profession.

In their arguments, counsel for both Government and defense noted that all expert witnesses had indicated that they felt bound by the provisions of AFM 160–42. However, defense counsel insisted that, aside from the restrictions of the Manual, they had agreed that Mrs. Covert was irresponsible—but he went on to urge that, even *within* those limitations, the members of the court were required to hold her to have acted without mental responsibility.

The law officer, in instructing the court-martial stated: "If the accused would not have committed the act had there been a military or civil policeman present, she cannot be said to have acted under an irresistible impulse." He neglected, however, to instruct the court specifically with respect to the possible effect of the psychiatric testimony on the issue of Mrs. Covert's premeditation.

### III

Treating first the two certified questions, we observe that United States v. Kunak, 5 USCMA 346, 17 CMR 346, provides a complete answer to both. There we reversed a conviction for premeditated murder and returned the cause to The Judge Advocate General of the Army for reference to a board of review. We stated:

"This brings us to an error which we conclude is fatal to the findings and sentence on premeditated murder. It involves the question of whether the law officer erred in failing to instruct the court-martial members that they might consider the mental deficiency of accused—short of insanity in the legal sense—in determining his capacity to premeditate. We have on several occasions mentioned the necessity of covering that issue by an appropriate instruction if it is raised reasonably by the evidence. One can hardly contend in this case that there was no substantial evidence of mental deficiency which might interfere with those mental processes. The instruction on premeditation is sketchy and

while the one defining insanity informed the members of the court-martial that they could not convict the accused of the crime charged if there was a reasonable doubt about his mental responsibility, it is deficient, for the purpose under consideration, in that it was tied up to legal insanity which would exculpate the accused of the offense charged and all included offenses. The law officer nowhere suggested the important principle that mental impairment, less than legal insanity, might be considered by the court-martial members when they were deliberating upon the element of premeditation. Significantly, missing in this case is an instruction to the effect that if in the light of all evidence the court-martial has a reasonable doubt that the accused was mentally capable of entertaining the premeditated design to kill involved in the offense of premeditated murder it could find the accused not guilty of that degree of the crime."

### IV

We cannot accept the accused's claim that the evidence is insufficient to sustain her conviction. We are sure that our statement of the Government's evidence on the issue indicates that the members of the court could reasonably have reached a conclusion that the accused was mentally responsible. While we believe that certain of the psychiatrist witnesses predicated their conclusion of responsibility on an incorrect interpretation of AFM 160–42—as we shall develop later—we do not consider that this phenomenon warrants dismissal of the charges for insufficiency.

Moreover, the presumption of sanity must be taken into account. Certainly in this case—and probably in almost any other—that presumption will be sufficient to shield a finding of guilty from a holding that, *as a matter of law*, the accused was mentally irresponsible. Of course, the presumption would not serve to preclude a board of review, or other reviewing authority with general fact-finding power, from weighing

**55**

the evidence for the purpose of determining whether, *as a matter of fact,* the charges should be dismissed, or returned for a rehearing. In this connection, the following comments from United States. v. Biesak, 3 USCMA 714, 14 CMR 132, seem apposite:

"Such reasoning has been utilized in dealing with the presumption of sanity. The Massachusetts court—among others—has indicated that, although the presumption of sanity may vanish, 'the fact that a great majority of men are sane and the probability that any particular man is sane may be deemed by a jury to outweigh in evidential value testiony that he (the accused) is insane.' Commonwealth v. Clark, 292 Mass 409, 198 NE 641. See also, Commonwealth v. Cox, 327 Mass 609, 100 NE2d 14. Cf. People v. Chamberlain, 7 Cal2d 257, 60 P2d 299. The court added—properly and cautiously—that it is not 'the presumption of sanity that may be weighed as evidence, but rather the rational probability on which the presumption rests.' Our decision in United States v. Burns, supra, reaches the same result, although the point was not then expressly considered by us. In that case the Government relied solely on the 'presumption of sanity,' but the defense offered psychiatric testimony that the accused was insane. Upon review we ordered a rehearing for failure of the law officer to instruct the court concerning insanity, which had been raised by the evidence. We did not, however, dismiss the charges, which would seem to have been called for if the 'presumption of sanity'—or, at least, the rational probability which is the core of that presumption—were insufficient to sustain a finding that the accused was sane."

V

Moving to the appellant's second point, we observe that the terms of AFM 160–42 are identical ▬▬▬▬■ with those of TM 8–240, which has been before us recently in two cases. United States v. Kunak, supra; United States v.

Smith, 5 USCMA 314, 17 CMR 314. Indeed, TM 8–240 and AFM 160–42 were promulgated jointly by the Departments of the Army and the Air Force—with the result that we deem applicable to the latter publication the remark of the majority of this Court in United States v. Smith, supra:

". . . However, we have never held—or believed—that the Technical Manual in question was of itself in any way binding on this Court, nor intended to be controlling on either a court-martial or an expert witness."

Yet it is unmistakable from the testimony of all of the expert witnesses—and the comments of counsel for both Government and defense—that, in the present trial, AFM 160–42 was regarded by the experts as controlling, and was of infinitely greater influence on the psychiatric testimony than was TM 8–240 in either Smith or Kunak.

This influence would appear harmless—to the extent that the principles prescribed in AFM 160–42 for the determination of mental responsibility constitute correct statements of military law. In this connection we must advert once more to the "policeman at the elbow" test, which played a major role in the present trial, and which was promulgated in paragraph 5a of the publication with which we are concerned here. In speaking of this somewhat ambiguous test, the majority said in United States v. Smith, supra:

"The basic difficulty is that which may arise from a too literal application of the 'policeman' test. Perhaps, indeed, the accused would not have committed the offense in the company of a policeman, or of anyone else for that matter, for the plain reason that he wished to act in private—this despite the fact that he nonetheless knew he would be apprehended forthwith. Perhaps, too, he would not have attempted the deed with a policeman at his elbow, because he feared that the policeman would halt him prior to its completion. Cf. Davidson, Forensic Psychiatry, supra, page 8; Neustatter, supra, page 97. Also, perhaps the presence of a policeman would have

served to make more vivid to his mind the prospect of ultimate apprehension and punishment. And perhaps, finally, the presence of the policeman would have exercised some other symbolic effect in precluding or delaying the commission of the offense —quite apart from the probability of detection and punishment arising from his presence. Cf. MacNiven, Psychoses and Criminal Responsibility, Mental Abnormality and Crime, 1944, page 53.

"These possibilities appear to be somewhat theoretical. Yet psychiatrists on occasion are prone to draw distinctions difficult for lawyers and judges to comprehend. In light of these, it is distinctly possible that the 'policeman' test—literally applied— may mislead. Therefore, the wording of the 1953 edition of TM 8–240 should be utilized as a guide for instructions and the like. Indeed, in a case in which it is clear that the trial was premised on an erroneous, overly literalistic construction of the 'policeman' test, as phrased in the 1950 Technical Manual, we might well be compelled to reverse."

In the case at bar we entertain no doubt that a much too literalistic interpretation of the "policeman" test was adopted by both Captain Graves and Colonel Martin. For them, it was not the likelihood of *apprehension* implicit in the test which served as the criterion. As a matter of fact, absent any sort of policeman, and pretermitting subsequent admissions on Mrs. Covert's part, the likelihood of detection of her crime was little short of enormous. Quite understandably the accused—contemplating suicide as she seems to have been, according to evidence from both defense and Government—would have been unaffected by any degree of probability that her act would be discovered by the police, even if she had been able to weigh that probability consciously. On the other hand, the presence of a policeman, *or that of any other person,* might have shocked Mrs. Covert from pursuance of her dazed and virtually automatic behavior—completely apart from any suggestion of apprehension and ultimate punishment. In Captain Graves'

view, the presence of her children would have served equally well—better perhaps in fact—to prevent Mrs. Covert's commission of the crime, regardless of whether their appearance in the room would have enhanced the probability of detection and apprehension to any measurable extent. Perhaps Colonel Martin in his post-trial affidavit best expressed this concept, which he seems to have shared with Dr. Graves. He indicated that the presence of a policeman, or of anyone else, "at the elbow" would have served as a slap in the face, which would have startled the accused from her virtual trance.

It will be recognized, of course, that, when properly applied, the "policeman" test, as provided in AFM 160–42, is not at all directed to the effect of a policeman's presence as a "slap in the face," but rather to its suggestion of the likelihood of immediate detection of the crime and apprehension of the perpetrator. United States v. Smith, supra. By reason of their obvious misinterpretation of the publication under consideration—which, like the experts called by the defense, they mistakenly interpreted to possess *per se* a binding force —Colonel Martin and Captain Graves concluded that the accused *could* adhere to the right. Under a correct interpretation they—and conceivably Major Troy too—might well have concluded that the accused had been irresponsible mentally at the time of the killing. We simply cannot know what they would have believed in the present circumstances.

The error in applying the "policeman" test is too pervasive here to permit affirmance of the findings of guilty. In this connection, the present situation can be distinguished with ease from that exemplified in United States v. Smith and United States v. Kunak, supra. In the former, the real issue at the trial was whether Mrs. Smith was suffering from a mental defect, disease or derangement within the meaning of the Manual for Courts-Martial. This circumstance fortified the majority in its conclusion that there was no significant possibility that the result at the trial might have been influenced by any misinterpretation of, or ambiguity in,

**57**

the "policeman" test promulgated in the relevant Army Technical Manual. On the other hand, Mrs. Covert suffered —according to the Government's experts—from a dissociative reaction, which is regarded in the Joint Armed Forces Psychiatric Definitions, SR 40–1052–2, NAVMED P–1303, AFR 16–13A as a psychoneurotic condition, and is clearly not a character and behavior disorder. Indeed, apparently all of the psychiatrists here would have agreed that the accused labored under a mental disease or derangement—and the critical issue had to do with the extent to which this mental disease or derangement had operated to destroy her ability to adhere to the right. In resolving this issue, the accused was distinctly prejudiced by a palpable misconstruction of AFM 160–42, from which the law officer failed to relieve her.

In the Kunak case, the concurrence stressed that the defense was scarcely in a position, under the circumstances of that case, to take advantage of ambiguities in the "policeman" test. Also, Judge Latimer explained there that the instruction by the law officer based on this test might well have been beneficial to the accused. As a matter of fact, Kunak's defense of irresponsibility— like that of Mrs. Smith—encountered as its initial and chief obstacle the conclusion by expert witnesses that he was suffering from a mere "character and behavior disorder." Mrs. Covert, however, met no similar difficulty—for *all* of the experts in this case appear to have agreed that hers was more than a character disorder. Her hurdle lay in the misconstrued "policeman" test— one with which her defense should never have been confronted.

In view of our disposition of the second issue specified under the accused's petition, it is unnecessary that we deal in detail with the remaining two.

### VI

Before terminating this opinion, it should be commented that the record reveals a defense presentation by Major George J. Schweizer—military defense counsel at the trial—which could scarcely have been excelled in alertness, ability, and preparation, and which furnished the accused with a firm foundation on which to capitalize for appeal purposes on the ambiguity in the "policeman" test.

Since it is evident that a rehearing is required if we are to avoid the danger of a substantial miscarriage of justice, the record of trial in the instant case is remanded to The Judge Advocate General, United States Air Force, for rehearing or other action not inconsistent with this opinion.

QUINN, Chief Judge (concurring):

In my dissent in United States v. Kunak, 5 USCMA 346, 17 CMR 346, and in United States v. Smith, 5 USCMA 314, 17 CMR 314, I deprecated the Court's sanction of the use of service manuals on psychiatry as affirmative evidence in a court-martial trial. In the *Kunak* case, I pointed out that this kind of technical manual "circumscribes the testimonial freedom" of the military expert witness. In the *Smith* case, I noted that the military medical experts were obviously testifying to what they believed the service manuals required, "to the exclusion of their individual professional beliefs." This case confirms my fear that use of the technical manuals on psychiatry are depriving the accused of the right to unbiased and truly professional opinions from military psychiatrists.

I am glad Judge Brosman has recognized the improper influence of the technical manual in this case, and I concur with him in setting aside the conviction and ordering a rehearing. At the same time, I cannot refrain from expressing regret that he has not joined me in a general condemnation of the present use of the service manuals as a restrictive influence on the testimonial freedom of the service doctors.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

I do not share the regrets of the Chief Judge and I do not join in his reasons but his position has consistency in its favor. Certainly, if each future case is to be decided on the basis of whether the military experts in the

field of psychiatry do or do not understand the principles which they teach and promulgate, then he has the best side of the argument. However, his assertions do not encourage my support because a careful reading of the opinions in United States v. Kunak, 5 USCMA .346, 17 CMR 346; and United States v. Smith, 5 USCMA 314, 17 CMR 314, will disclose that the author of the present base opinion has not changed the principles a majority of the Court therein announced. All he has done is to escape their effect by a side door exit which can be labelled the door for confused experts. Obviously, his purpose is to differentiate this case from those on a narrow ground, but one which I do not find supported by the record. Because of that and because this result is reached through a three-way conceptual approach, with no new principles of law established, an extended discussion of the questions certified and the errors assigned is unnecessary. However, I consider it advisable to place on record my reasons for not joining in an order directing a rehearing in this case.

The disagreement between Judge Brosman and the writer narrows to the single question of whether the psychiatrists who testified for the Government misunderstood one criterion proposed as a means of measuring an irresistible impulse. I conclude they did not and I hope to support my views by a reference to their testimony. In addition, while I will not develop the point, I believe it distinctly arguable that even assuming the medical experts favorable to the Government misunderstood the test, the confusion was beneficial to the accused.

It is of singular importance to note that four psychiatrists and one psychologist testified at the trial. They were stationed in the same military community, all worked together on this particular case, and each had the benefit of the findings and conclusions of the other. Their education, training and experience was extensive and their qualifications to understand and deal with the principles of psychiatry must be conceded by all. One psychiatrist and one psychologist testified in support of the accused. Two psychiatrists

testified partly in support of the Government's cause and partly in opposition thereto. One psychiatrist testified solely in favor of the prosecution's theory. It could happen, I suppose, but it is a bit unusual that only those who testified that the accused was sane are charged by the majority opinion with having misunderstood a principle of psychiatry which dates from the time of the McNaughten rule. They alone are charged with misapplying the policeman at the elbow illustration found in the Air Force Technical Manual. While this case turns on the possibility of misinterpretation found by the majority, I am perfectly willing to accept as my first supporting witness, Dr. Heisler, a very fine defense witness, who testified to the effect that the principles outlined in the Air Force Technical Manual are easy to work with. He had this to say on the matter:

"Q The defense counsel has cited certain textbooks with which you have said you were familiar, as authorities in the field of psychiatry. Are you also familiar with Air Force Manual 160–42, Psychiatry in Military Law?

A Yes, sir.

"Q Do you consider that to be an accurate statement of psychiatry as applied to military law?

A To the military law, yes. It's a regulation which we must follow.

"Q Are you in agreement with it?

A Essentially, yes. I believe that —let's put it this way: one can easily work within the framework of the interpretations given in that manual, and we make every attempt to do so."

Moreover, in answers to questions propounded by defense counsel—and, parenthetically, I add that all of the expert witnesses were entitled to exercise the same mental freedom exercisd by Dr. Heisler—he replied:

"Q Doctor, do you think it would have made any difference on the night of 10 March, to use an old and classic example, if a policeman had been standing near her?

A I don't think it would have made

**59**

any difference, short of physical restraint.

"Q Doctor, in your examinations and conferences with her, has Mrs. Covert ever made any statement as to whether or not any person who might have been standing there would have influenced her or not?

A Yes; she did.

"Q What did she say, Doctor?

A Well, the first occasion when it came up more or less spontaneously, she stated—I think, being a Southerner—it wouldn't have made any difference whether General Sherman had been standing there or not, and on subsequent occasions, taking into consideration the legal questions involved—this was a couple weeks later—I asked her specifically about the question relating to a policeman being there, and she felt that she would not even have noticed the policeman. She interpreted the question herself on that occasion as meaning he would physically restrain her, which makes the answer obvious that she herself felt it, which corroborates my own impression that, short of physical restraint, she would neither have noticed or been deterred by the presence of any other individual, as she was not deterred by the presence and very close approximation of her two children to the scene of this act."

As my next supporting witness, I rely on Dr. Adelsohn, a psychologist, who, like Dr. Heisler, testified definitely and positively that Mrs. Covert was insane. He seems not to have been mentally disciplined by the Technical Manual in the expression of his views and to have understood how the test could be applied to establish insanity. This is his testimony:

"Q Are you familiar with the term 'irresistible impulse'?

A Yes; I am.

"Q Do you think that the definition of irresistible impulse is accurately stated when it is stated that it is an act that a person would do even if a policeman were at their side?

A I am acquainted with that, the use of that criterion.

"Q You believe that is an accurate definition of what it is?

A I consider it a rather accurate definition; yes.

"Q Do you believe that an irresistible impulse is an act that a person would commit even if there were policeman [sic] at their side?

A It appears to me that the policeman being alongside is merely one of many possible criteria by which one can determine whether an act is motivated by an irresistible impulse. In other words, I don't believe I can accurately answer your question very flatly. May I try to clarify that?

"Q Go ahead.

A I believe there are other conditions that can—other ways of determining whether an impulse is an irresistible one. The policeman being alongside is certainly a perfectly legitimate one, I feel.

"Q Are you familiar with Air Force Manual 160–42?

A Not well, but I have read it.

"Q Calling your attention to paragraph 5c, wherein irresistible impulse is defined as an act that a person would not have committed if there had been a military policeman at his elbow; do you believe that that is a complete and accurate definition of the term?

A Yes; I do. I accept it."

If, as these defense witnesses testified, the test is accurate and easy to apply, I wonder why the testimony of the two experts whom I catalogue as testifying partly to the benefit of the accused and partly to assist the Government is interpreted as showing confusion. I place Doctors Martin and Graves in sort of a neutral class for the reason that, while both testified the accused could distinguish right from wrong and adhere to the right, each expressed an opinion that her mental faculties were so impaired that she did not have the capacity to premeditate. However, their post-trial affidavits show clearly they were favorably inclined toward the accused. While Dr. Graves was not asked to express an opinion on the policeman at the elbow test, I find these questions and answers in the record:

"Q Do you believe, from your observation of the accused, that the act

she committed on the 10th of March was the result of an irresistible impulse?

A Irresistible impulse is not a term that we use in psychiatry. I would have to ask you to define what you mean by 'irresistible impulse' before I could answer your question, I think.

"Q I call your attention to the definition of irresistible impulse in Air Force Manual 160–42, Psychiatry in Military Law, to paragraph 5c, which sets out the example that the accused would have committed the act even if there had been a policeman at her elbow as being an example of an irresistible impulse; and with that definition in mind, I ask you, do you feel that the accused acted as a result of an irresistible impulse?

A No.

"Q Do you feel that if a policeman were present, or someone else were present, she would have refrained from the act?

A Yes, I do.

"Q You have stated that she was able to adhere to the right, had she chosen to; is that correct?

A Yes."

This witness had testified that the accused could distinguish right from wrong at the critical time. He followed that testimony by asserting that Mrs. Covert could adhere to the right and he was then asked how he made that determination. In substance he stated that she committed the offense under strong emotional pressure but he concluded she could adhere to the right because her whole life's pattern was to that effect, and he found nothing which would indicate that at the time of the killing she would not be guided by her previous pattern of behavior. If that was the basis for his conclusion, the one Technical Manual criterion played no part.

In connection with the testimony of Dr. Martin at the trial, the policeman at the elbow test seems to have been of little moment because if it was referred to, it was mentioned only once. That particular criterion is probably involved in the following single question and answer:

"Q In answer to one of the defense counsel's questions, I believe the gist of the answer was that the rightness or wrongness of the act did not influence her behavior. Do you mean by that answer that her act was an irresistible impulse, as defined by Air Force Manual 160–42?

A With that qualification, as defined by this manual, I do not feel that it was what they call an irresistible impulse."

As I hope to develop later, while Dr. Martin's ultimate conclusion may have been influenced in part by this test, he did not complain because he misunderstood it, but because he believed the general principles of psychiatry set out in the Technical Manual were too restrictive. Beyond question he asserted that the accused could distinguish right from wrong and that her ability to adhere to the right was only partially impaired and not totally abrogated. He, however, subsequently sought to make that partial impairment sufficient proof of insanity to exculpate the accused from the legal wrong of the homicide— a position a majority of this Court has refused to take.

Major Troy was the one expert who testified that Mrs. Covert had the mental capacity to form an intent to kill and to premeditate and that she was sane and responsible for her act. He was interrogated about the policeman at the elbow test and he had this to state:

"Q Are you familiar with the provisions and standards laid down of mental responsibility in Air Force Manual 160–42?

A Pretty well.

"Q Under the standards laid down in that manual and the definitions therein, do you consider that at the time she committed the act on 10 March 1953, she did so as the result of an irresistible impulse, as therein defined?

A No; I do not believe it was an irresistible impulse.

"Q You believe she would have committed the act had there been a policeman at her side?

A No; I do not believe she would have."

He was cross-examined at some length on the general principles of psychiatry as announced in standard works and he showed substantial agreement with those principles but he was unshaken in his belief as to the sanity of the accused. Nothing in his direct or cross-examination leads me to conclude that he did not well and truly understand and use the criterion. Apparently I am not alone on this conclusion as my associate has not persuasively presented him as one of the experts operating in the area of confusion.

I have searched the record of trial rather diligently and I am unable to find any expert who claimed he was confused by the criterion or that he misunderstood its underlying concept. No one at the trial level seemed to have been conscious of any misapplication of the test and all must have considered it in arriving at their conclusions. Those who were asked, testified it was appropriate and accurate, and they apparently used it to their own satisfaction. No one expressed any reservations about its application until after findings and sentence and then the findings brought forth some protests. I, therefore, pass on to consider the post-trial affidavits. Before doing so, I prefer to mention again that the training and qualifications of the five experts who were called as witnesses cause me to wonder how doctors who were so well trained, educated and experienced in the field of psychiatry could misunderstand a basic principle which has long been a cornerstone in determining mental responsibility. As a general observation, I would say, in the light of the education, training and experience of these experts, and from the amount of time they expended in examining this accused, I believe this case is a poor vehicle for supporting a contention that those who testified could not interpret and apply properly the various criteria by which the irresistibility of an impulse may be tested.

There were post-trial affidavits furnished by Doctors Martin, Graves and Adelsohn. Dr. Adelsohn in no way questioned the Technical Manual and he merely corroborated his in-court testimony. At the trial and in his affidavits he stated the accused was suffering from "psychosis, specifically, paranoid schizophrenia." Furthermore, in his post-trial statement he related his disagreement with certain other expert witnesses by saying he could not concur with "a finding of neurotic depression, as that is counter-indicated by the bulk of the data I have gained from the patient's responses, and I am of the opinion that this data was not effectively or intensively examined by the members of the Sanity Board."

Dr. Graves' views, as expressed in his post-trial statement, can best be stated by quoting part of his affidavit. It provides:

"I should like to make clear to the reviewing authority, that which I apparently did not make clear to the members of the court, that the members of the Sanity Board were, of necessity, governed in making their decisions by the provisions of Air Force Manual 160–42. It has been difficult for me, and I assume for other members of the Board, to clearly express our feelings about this case within the framework of this Air Force Manual. According to the provisions of this Manual, I, as a Psychiatrist, had no choice but to find this individual sane. In the field of psychiatry however, more than in any other field of human knowledge, it is impossible to express the complexities of human behavior in terms of black and white. As a psychiatrist it is my training and my professional function to view all human behavior in its proper shade of grey. I clearly understand that it is the purpose and duty of the members of the court to consider my evaluation of the 'shade of grey' terms. However, it does not follow that because the patient was not insane at the time of the commission of the offense that she must therefore necessarily have been guilty of an [sic] conscious *premeditated* crime. There is, I must state again, no psychiatric evidence of any sort which would lead me to be-

lieve that there was sufficient degree of conscious participation in the planning and execution of this act to refer to it as a premeditated crime. To consider it as such would in my opinion, from considerable knowledge of the past history and personality structure of this person, be a clear cut miscarriage of justice."

I cannot find in that statement any attack on the policeman at the elbow test and the restrictions imposed by the Air Force Manual embrace principles far more important than the illustration of an irresistible impulse given there. As I read this witness' trial testimony, he states unequivocally that the severe emotional stress under which the accused was laboring only impaired her mental capacity to know right from wrong and adhere to the right. To support his conclusion he used several criteria. His affidavit in no sense undermines his conclusion on partial impairment and its principal attack centers on the finding of premeditation.

Dr. Martin's post-trial affidavit contains no assertions that he misunderstood the Technical Manual and only by asserting that he misunderstood several criteria mentioned by him can that conclusion be reached by the majority opinion. He should be the best witness to his own confusion and as I read the record, I believe he well understands the purpose and intent of the doctrine announced by the Air Force. He does not misunderstand, he just honestly disagrees. He does not say that the policeman at the elbow test is different from a fear of detection test. As a matter of fact he does not mention the latter, but if he is at all familiar with the 1950 Technical Manual, and I must assume he is, he should be well aware that the sentence which specifically deals with the policeman at the elbow test is followed by this statement: "No impulse that can be resisted in the presence of a high risk of detection or apprehension is really very 'irresistible'." Moreover, his enumeration of several different criteria does not mean one is the exact counterpart of the other. More probably he was expressing different rules by which he measured his conclusion that the accused did not

reach the irresistible impulse stage. He, too, positively testified—and this conclusion is not modified by his subsequent statement—that the mental impairment of the accused was only partial. He might like to escape the principle that a partial impairment does not render the accused mentally irresponsible, but I had thought a range as wide as he probably desires to roam had been narrowed by our decisions in Smith and Kunak. Now I find it is widened by a different method of approach. It may well be that I, in turn, misunderstand his purpose; but, in my opinion, what he is seeking in the way of a principle is this: That if the accused is suffering from a dissociative reaction, and it is not of sufficient severity to deprive her completely of her ability to adhere to the right, the psychiatrist should be permitted to erect his own standards of insanity. He would not testify that Mrs. Covert was psychotic and neither would he testify that her personality breakdown resulted in a total impairment of her capacity to know right from wrong or adhere to the right. He kept her within the area of sanity as we have defined it and yet he would like to remove her. His complaint, closely analyzed, is that a psychiatrist should be permitted to base a conclusion of insanity on his finding that an accused is not fully responsible for his or her behavior.

Dr. Martin sums up his belief in his own words and they support my assertion. He displays his desires in the following words:

"All of my feelings about this case can be summed up in the statement that I believe Mrs. Covert was what I would call 'temporarily insane' on the night of 10 March 1953. Since this is a legal and not a psychiatric term, I may have the wrong understanding. The term 'insanity', to me, means that the individual is not responsible for his or her behavior. My understanding of 'temporary insanity' does not make it synonymous with the term 'psychosis'. There are a number of mental or emotional reactions not included in Air Force Manual 160–42 which I could classify as a form of insanity from my understanding of the term that would more adequately

**63**

describe the condition of Mrs. Covert on the night of 10 March without saying that she was psychotic."

I realize it is possible to take statements out of context and use them to support a theory, but a fair reading of this record convinces me that confusion concerning certain principles of psychiatry did not exist in the minds of these experts. What I do find in the record is a disagreement in the ultimate conclusions of the experts. The disagreement arises solely over whether Mrs. Covert's depressed reaction had reached such a level that there was a total abrogation of her mental capacity to adhere to the right or whether there was a partial impairment which left her some degree of choice.

Doctors Heisler and Adelsohn were convinced completely that Mrs. Covert was psychotic and acted as an automaton; that nothing short of physical restraint would have prevented this killing; and that she was legally insane. Doctors Martin and Graves would not go that far as they concluded there was only a partial impairment of the capacity to adhere to the right. They believed that her condition could not be characterized as psychotic and that she was legally sane, but stated that if they were free to use their own standards for sanity, they would find her insane. Dr. Troy stood off by himself as he concluded there was no impairment in her capacity to know right from wrong and adhere to the right and she was sane and could premeditate.

In the light of our previous holding, I fail to see how Dr. Graves and Dr. Martin can be freed from some discipline by our pronouncements on psychiatric principles. Both testified that the accused could distinguish right from wrong and adhere to the right. At best they could only find a partial impairment in her mental capacity. However, not only does the Technical Manual set out the principle that partial impairment may not be equated to mental irresponsibility, but the Manual for Courts-Martial, United States, 1951, has the same provision. In paragraph 120*b*, I find the following:

". . . To constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement but must also completely deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged. Thus a mere defect of character, will power, or behavior, as manifested by one or more offenses, ungovernable passion, or otherwise, does not necessarily indicate insanity, even though it may demonstrate a diminution or impairment in ability to adhere to the right in respect to the act charged. Similarly, mental disease, as such, does not always amount to mental irresponsibility."

In United States v. Smith, supra, Judge Brosman, speaking for the majority, had this to say about that provision:

"The Manual for Courts-Martial emphasizes that 'to constitute lack of mental responsibility the impairment must not only be the result of mental defect, disease, or derangement but must also *completely* deprive the accused of his ability to distinguish right from wrong or to adhere to the right as to the act charged.' Paragraph 120*b*. (Emphasis supplied.) Thus, mere *impairment* of the ability to adhere to the right does not constitute a defense, although it may form a mitigating circumstance. Paragraphs 120, 123. The emphasis on *complete* inability to adhere to the right renders it difficult to deem mentally irresponsible an accused person who would not have performed the act had there been an appreciable likelihood that he would be arrested and punished."

Even though that principle may, in the words of the psychiatrists, be too narrow and restrictive, I believe we have placed our approval on it and I have no desire to retreat. That concept, of course, narrows the area in which medical experts may operate, contrary to the wishes of some of them, but it furnishes a satisfactory staff for the experts and the Courts to lean upon.

Finally, in United States v. Smith, supra, a majority of this Court reached

the conclusion that the provisions embracing the policeman at the elbow test and the fear of detection test, while differing somewhat in wording, possessed an identical core of meaning. If we could so conclude from our understanding and knowledge of the principles of psychiatry, I am willing to concede the experts who testified in this instance had the perspicacity to reach a similar conclusion long before this case was tried. If I must choose on the basis of this record, I would conclude that any claimed misapplication of principles is imagined at this level. For the foregoing reasons, I would answer the questions of The Judge Advocate General of the Air Force and dispose of the assignments of error by reversing the finding of premeditation, affirm a finding of unpremeditated murder and return the case to the board of review for reconsideration of the sentence.