UNITED STATES, Appellee

v

HUEY T. MARDIS, Sergeant, U. S. Army, Appellant

6 USCMA 624, 20 CMR 340

No. 7083

Decided February 3, 1956

*Captain Albert C. Malone, Jr.,* argued the cause for Appellant, Accused.

*First Lieutenant Arnold I. Burns* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant A. Kenneth Pye.*

### Opinion of the Court

GEORGE W. LATIMER, Judge:

Following trial by general court-martial, the accused was convicted of wrongfully keeping a disorderly house, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to bad-conduct discharge, total forfeitures, and confinement for six months. The convening authority suspended the execution of the punitive discharge, but intermediate appellate authorities have otherwise affirmed. We granted review to determine whether the law officer erred in failing to instruct the court-martial members that they must find the house was used as a place for illicit intercourse with the knowledge of the ac-

cused, before they would be justified in reaching a verdict of guilty. I have set forth at some length my views concerning the role played by knowledge in this offense. However, the Chief Judge has not reached this problem, as he concludes that no issue of knowledge was raised. Therefore, my beliefs have been labeled throughout as mine alone.

During the period June 1954 to September 15, 1954, the accused and his wife occupied family quarters at Fort Hood, Texas. Miss Sally B, a prostitute, and later Miss Shirley W, a follower of the same profession, shared the abode. Rather than detail the sordid facts, it is enough to say that the

evidence justifies the conclusion that the quarters were used as a base of operations by Miss B and Miss W, and that Mrs. Mardis was similarly occupied from time to time. The accused was normally present at the apartment during his off-duty hours, and it was shown that he was present on at least one occasion when a fellow-soldier remained overnight with Miss B. When the trafficking came to the attention of the authorities, the accused was interrogated and admitted that he knew of the activities of Misses B and W while they were working in his quarters and that he had permitted them to move in with the understanding that he was to share in the proceeds.

The accused testified at trial that his pretrial statement was false, although voluntary. He asserted that at the time of the acts he was unaware that prostitution was being carried on in his home. He sought to justify the false statement by contending that it was uttered in the hope that his wife would come forward and tell the truth concerning her activities, rather than have him bear the mantle of keeper of a bawdy house. He further testified that he had never received anything of value from Miss B or Miss W, and had never agreed to accept any consideration from them for the use of his quarters.

## II

Following the presentation of evidence by the parties, defense counsel requested the following instruction:

"Further as to the element of keeping, you are advised that the term 'keep' as used in this specification and charge embodies elements of knowledge and consent, that is, to find the accused guilty as charged you must find that the alleged acts of illicit intercourse occurred with the knowledge and the consent of the accused, and if you find otherwise, you are advised that you must find the accused 'not guilty'."

The law officer refused to give this requested instruction, and the propriety of his action in this regard frames the important issue which concerns me. Although the requested instruction concerned itself with both the problem of knowledge and the definition of the word "keep," the two are interwoven here to the point where I am sure I may properly treat them as one question. It is clear that had an instruction on knowledge been given, no separate explanation of the legal meaning of the word "keep" would have been important.

In determining whether knowledge by the accused of the use to which his quarters were put was material, it is worth noting initially that the offense of keeping a disorderly house is not discussed in the current Manual for Courts-Martial, United States, 1951. No form specification is provided, and the offense is not mentioned in the Table of Maximum Punishments. It was the theory of the prosecution, however, that such an act would be prejudicial to good order and military discipline. Furthermore, it is the contention of the Government, and not seriously disputed by the accused, that under those circumstances a law of local application within the District of Columbia may be relied upon in such a prosecution to determine the elements of, and maximum punishment for, such an offense. This approach seems to find sanction in the Manual, supra, paragraph 213 c, pages 383–384, which first provides that only Federal offenses of unlimited application are included in the "crimes and offenses not capital" clause of Article 134, and then goes on to say:

". . . For example, a person subject to military law cannot be prosecuted under the third clause of Article 134 for having committed a crime or offense, not capital, when the act occurred in occupied foreign territory, merely because that act would have been an offense against the law of the District of Columbia if it had been committed there. Such an act might, however, regardless of where committed, in a proper case be prosecuted under the first or second clause of Article 134 as a disorder or neglect to the prejudice of good order or discipline or as an offense of a nature to bring discredit upon the armed forces."

**627**

Under the circumstances of this case, it is not important that I ascertain the weight of authority in ██ civilian jurisdictions with respect to the issue of whether knowledge is an element of the offense presented here. It is, however, important to observe that the District of Columbia law upon which I rely is not without support in the civilian communities. Without question those authorities are divided sharply as some states and municipalities have seen fit expressly to include knowledge as an element of this offense. Commonwealth v Altenhaus, 317 Mass 270, 57 NE 2d 921 (1944); State v Coste, 11 NJ 239, 94 A2d 303 (1953). Others have expressly provided that evidence showing either knowledge or "reasonable cause to know" is enough to support a conviction. State v Morin, 126 Me 136, 136 Atl 808 (1927); People v Foster, 193 Misc 190, 83 NYS2d 571 (1948). A number of appellate courts have read into the statute before them a requirement that actual knowledge must be proved, People v Shenk, 181 App Div 753, 168 NYS 886 (1918); People v McCarthy, 119 NYS 2d 435 (1953); Rosencranz v United States, 155 Fed 38 (CA 9th Cir) (1907); Warshaw v City of Norfolk, 190 Va 862, 58 SE2d 884 (1950); City of Ottumwa v Stickel, 195 Iowa 988, 191 NW 797 (1923); Bennett v Commonwealth, 182 Va 7, 28 SE2d 13 (1943); Pope v Commonwealth, 131 Va 776, 109 SE 429 (1921); State v Western Union Tel. Co., 12 NJ 468, 97 A 2d 480 (1953); State v Baldino, 11 NJ Super 158, 78 A 2d 95 (1951); Fitzgerald v State, 10 Ga App 70, 72 SE 541 (1911); Bolden v State, 88 Ga App 871, 78 SE2d 368 (1953); although they are not unanimous on the question of whether instructions on the subject are essential, Bennett v Commonwealth, supra. Other courts, when considering a statute which did not expressly mention knowledge (or "cause to know") in defining the offense, have concluded that the state need not prove that ingredient. State v Gaetano, 96 Conn 306, 114 Atl 82 (1921), saying, "whoever in fact keeps a house which is a house of ill fame should take the risk of knowing the facts"; Bass v State, 66 SW 558 (Tex) (1902); Secrist v State, 131 Tex Cr 182, 97 SW 2d 196 (1936).

My immediate problem brings to major importance the laws of the District of Columbia, and when I turn to them I find two separate provisions which merit consideration. Section 22–2722 of the District of Columbia Code (1951) provides:

"Any person convicted of keeping a bawdy house or disorderly house shall be punished by a fine not exceeding five hundred dollars or punishment not exceeding one year, or both."

This is to be compared with Section 22–2712 (Running home of prostitution —Penalty), which states:

"Any person who, within the District of Columbia, knowingly, shall accept, receive, levy, or appropriate any money or other valuable thing, without consideration other than the furnishing of a place for prostitution or the servicing of a place for prostitution, from the proceeds or earnings of any female engaged in prostitution shall be guilty of a felony and, upon conviction, shall be punished by imprisonment for not more than five years and by a fine of not more than $1,000."

It is at once apparent that the latter statute specifically mentions knowledge on the part of the defendant, and the receipt by him of gain of some sort in the operation of a disorderly house. Furthermore, the penalty provided in the latter enactment is far more severe than that set forth in the former. Accused contends vigorously that the Government based its prosecution under the foregoing section. However, it is quite clear to me that it elected to proceed under Section 22–2722, supra, for the specification reads as follows:

"In that . . . [the accused] . . . did, at his assigned quarters in Fort Hood, Texas, from on or about 1 June 1954 to on or about September, 1954, wrongfully and unlawfully operate and keep a disorderly house, to wit: a house of prostitution."

While the word operate is used, there

is in the specification no allegation of the important element of gain from the earnings of any female. In addition, the law officer tailored his instructions to fit the specification and limited the court-martial, for sentencing purposes, to the maximum term of confinement permitted by Section 22–2722, supra. Accordingly, I am of the opinion that the critical problem is the construction to be given to the language of the former section.

In De Forest v United States, 11 App DC 458 (1897), the defendant was convicted of keeping a bawdy house under a predecessor statute to Section 22–2722, supra. In construing the early enactment, the court said (page 463):

". . . It is enough that the acts done are contrary to law and subversive of the public morals, that the house is commonly resorted to for the commission of such acts, and that the proprietor knows, or should in reason know, the fact, and either procures it to be done, connives at it, or does not prevent it."

The court then proceeded to give its approval to the trial judge's charge to the jury, which included the statement that "every person is presumed to have knowledge of that which goes on in his own house."

I have found no later authority to the contrary and, to my mind, the foregoing authority leads me to believe that for over 50 years, within the District of Columbia, the offense of operating a disorderly house may be established even though the prosecution fails to establish affirmatively actual knowledge. I am strengthened in this belief by other sections of the District of Columbia Code which define other crimes of similar type, such as pandering and procuring. Sections 22–2705, 22–2707, 22–2710, 22–2711, District of Columbia Code, supra. Of course, it might be established that the accused knew the character of his dwelling, but it is enough to support a conviction to establish that the resorting, cohabitation, and other activities were so flagrant and notorious that the accused should have known his quarters were being used

for illicit purposes. That is not to say that lack of knowledge would not be a defense, but it would have to be founded on both honest and reasonable grounds, for it seems to be the expressed view within the District of Columbia that a man may not safely close his eyes to what is done within the four walls of his own establishment. Nor may I freely cast aside that interpretation as being unnecessarily narrow and harsh. Cf. United States v Stabler, 4 USCMA 125, 15 CMR 125. I am dealing here with an offense which might aptly be called an indictable misdemeanor and one which has a measurable impact on good public order and morality. In that area, actual knowledge need not be demanded. I, therefore, hold that actual knowledge—as distinguished from constructive knowledge—is not an essential element of this particular offense, but that ignorance of the fact may be a defense if it is both honest and reasonable.

When I turn to the instruction requested by defense counsel, it is at once apparent, as contended for by the Government, that it is erroneous in several respects. That is not fatal to defense counsel's position if it puts the law officer on notice of the theory of the defense. United States v Burden, 2 USCMA 547, 10 CMR 45. Next, there is more than superficial validity to the argument that the law officer had already covered the subject of knowledge adequately, for he had told the court-martial members that they must find the accused controlled a house used for prostitution. Under the facts of this case, "control" is an adequate synonym for "keep," and such a finding would, in all probability, include a finding of knowledge. However, I can disregard the previous arguments, for the record presents another compelling reason for affirmance, and in this I am joined by the Chief Judge.

We have consistently held that a law officer must give adequate instructions on the issue of lack of knowledge or ignorance of fact only when it has been raised reasonably by the evidence. And

this result has followed despite our varying views regarding whether to view knowledge as an element of various offenses, or its lack as an affirmative defense interwoven with those elements. United States v Simmons, 1 USCMA 691, 5 CMR 119; United States v Wallace, 2 USCMA 595, 10 CMR 93; United States v Hughes, 5 USCMA 374, 17 CMR 374; United States v Greenwood 6 USCMA 209, 19 CMR 335. When we apply those principles to this case, we can only conclude that the law officer did not err in failing to instruct thereon, because no issue of lack of knowledge was raised. We are certain that a brief reference to the evidence will demonstrate the soundness of that holding.

It was adequately shown that accused's quarters were used for purposes of prostitution for a period of over three months, and that the accused was customarily present there during his off-duty hours. The traffic was of sufficient volume to attract the unfavorable attention of his neighbors. It was shown that on at least one occasion he knew that a male friend of Miss B stayed overnight with her, and, further, that they were not husband and wife. Witnesses testified to having had intercourse with three women in the house, and accused's voluntary pretrial statement recited all the circumstances of his relationship with these women in fulsome detail. He recanted while on the witness stand, but his reasons for executing what he now contends to be a false statement can best be characterized as incredible and inherently improbable. Under those circumstances, his testimony was unworthy of belief and inadequate to raise an issue of lack of knowledge.

Accordingly, the decision of the board of review is affirmed.

QUINN, Chief Judge (concurring in the result):

In my opinion the issue of knowledge was not fairly raised by the evidence.

I concur in the result.