UNITED STATES, Appellee

v

IRA P. DOCTOR, Lieutenant Colonel, U. S. Army, Appellant

7 USCMA 126, 21 CMR 252

128

No. 6772

Decided June 8, 1956

*Sherwin B. Abrams, Esq.*, argued the cause for Appellant, Accused. With him on the brief were *Bernard Katzen, Esq.*, and *Major Edwin Doran*.

*First Lieutenant Edward S. Nelson* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant William K. Davenport*.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

At Kaiserslautern, Germany, a general court-martial tried the accused on four specifications of false swearing and one specification of wrongfully instructing an employee to testify falsely, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was found guilty on three specifications of giving false answers and sentenced to dismissal from the service, total forfeitures, and three years confinement at hard labor. The convening authority reduced the sentence to dismissal and total forfeitures, which was affirmed by the board of review. This Court granted review to make a determination of six questions which cover a variety of issues. We will state the questions specifically as they are considered later, but we believe at this point it is advisable to note that the offenses of which the accused stands convicted all arise out of answers given by him at an official investigation being conducted by an Inspector General.

The controversy which here concerns us arose in the following manner: The accused was in charge of installation and maintenance of communications within the Western Area Command, United States Army Europe. Generally speaking, the procurement procedure for that command required orders or requests for necessary supplies to show the purchase price of all articles, and the name of the firm from whom they were to be purchased. There was a central supply agency maintained by the Army, and the requisitions were forwarded to it. Upon receipt of the order, the agency would then purchase the items, having them shipped from the supplier directly to the unit making the request. The organization, upon the receipt of the items, would forward the invoice to the appropriate officer, who in turn would make payment to the supplier.

At a time when the accused's command was in need of nonexpendable equipment, he was advised that a sum of money had been allocated for use in acquiring expendable supplies. In order to obtain some nonexpendable types of equipment, the accused determined to divert a portion of the allotted funds. Thereupon, a request for expendable

132

supplies in an amount great enough to permit the acquisition of a predetermined number of nonexpendable supplies was prepared. In order to obtain the desired goods, it was necessary to arrange with the German suppliers to make appropriate substitutions. This was done under direction of the accused, and the plan contemplated that, regardless of the type of nonexpendable equipment furnished, the invoice was to show only expendable items. To protect the seller, the total amount pricewise of the goods furnished was to equal the amount of the order approved by the central agency. So far as it appears from the record, no profit, other than the supplier's legitimate profit was made by anyone.

The irregular transactions were discovered during a regular audit, and an inspector general was ordered to conduct an investigation of the misapplication of funds. The accused was hostile to the investigation and the officer selected. Accordingly, he was not at all cooperative, and, to say the least, by evasive and quibbling tactics he obstructed and annoyed the investigator. As a result of his testimony during the investigation, he was charged informally with irregular dealings with property and the giving of false and evasive answers to an inspector general. He was offered an opportunity to accept punishment under Article 15, Uniform Code of Military Justice, 50 USC § 571, and when he did not demand a court-martial, he was given a reprimand and fined $200.00. He appealed the sentence to higher headquarters, and the commanding general of that headquarters struck from the record all reference to false statements, but he refused to set aside the punishment. Accused demanded a court of inquiry, and when this request was refused, he petitioned for reconsideration. The subsequent court-martial was ordered only as the result of accused's persistent demand that some further forum hear his complaints and pass upon the merits.

## II

The first error assigned is that accused was denied a fair trial because trial counsel's final argument exceeded the bounds of fair comment. During his closing argument, counsel for the Government called the accused a phychopathic liar and a schemer who would falsify to anyone. It is undisputed that he referred repeatedly to the accused as a liar, and defense counsel calls our attention to the fact that the portion of trial counsel's remarks shown on page 1005 of the transcript reflect that the appellation was applied some twenty times. Appellant insists the statements were maliciously unfair, and were made solely to play on the passions and prejudices of the court members. He seeks to bolster his argument by asserting the court members found the accused guilty after deliberating only thirty-five minutes in a complicated trial which took over three weeks to complete. He also asserts the severity of the sentence imposed shows the court was prejudiced by the remarks.

The Government, on the other hand, contends trial counsel did not overstep the bounds of propriety; that construing his argument in a light favorable to the accused, it shows no more than an inartful choice of denunciatory words; and that, assuming he exceeded the limits of fair comment, his conduct does not call for reversal because the evidence of guilt is compelling.

Perhaps a reference to a few of the general principles operating in this field will be helpful. Trial counsel has the duty of prosecuting a case, and he is permitted to comment earnestly and forcefully on the evidence, as well as on any inferences which are supported reasonably by the testimony. He may strike hard blows, but they must be fair. Berger v United States, 295 US 78, 55 S Ct 629, 79 L ed 1314 (1935). If his closing argument has a tendency to be inflammatory, we must make certain it is based on matters found within the record. Otherwise it is improper. The issues, facts, and circumstances of the case are the governing factors as to what may be proper or improper. United States v Socony-Vacuum Oil Co., 310 US 150, 60 S Ct 811, 84 L ed 1129 (1940). We, therefore, must evaluate

the argument in the light of this record.

In the case at bar, trial counsel was prosecuting an accused charged with false swearing, or, to put it ■ another way, the point in issue was whether accused had falsified with intent to deceive. The latter took the stand and flatly contradicted the Government witnesses. His answers to the inspector general and his testimony from the witness stand had to be measured for their truthfulness. When the making of a false official statement is the offense to be proven and there are facts to support the charge, trial counsel is within the limits of reasonable persuasion if he calls the defendant a liar. Moreover, the posture of the evidence in this instance was such that either the witnesses for the Government or the accused were falsifying, and the prosecutor had a right to argue that his witnesses were telling the truth and the defendant was prevaricating. Obviously, the crime charged plays a decided part in the thrust of counsel's argument, and to deny the representative for the Government the right to call an accused a liar in a perjury or closely allied case, would seal his mouth to a point where he could only identify the crime by the loftiest of words. While we do not encourage the use of denunciatory comments, they may be used when they describe accurately the crime committed and when their use finds support in the testimony. Here, for the most part, the comments were well within the limits set out above.

Perhaps the portion of the argument which approaches the border of impropriety may be found in ■ trial counsel's statement that he did not cross-examine the accused because he disliked listening to lies being uttered from the witness stand. Obviously, that was not a comment on the evidence, nor was it reasonably inferable from any testimony uttered by any witness. However, it was precipitated by defense counsel's challenging criticism of the prosecuting attorney's failure to cross-examine the accused. Matters which ordinarily are not the subject of comment may become relevant if they are opened up by defense counsel. While we do not intend to create the impression that intolerant and inflammatory statements, or passionate appeals to prejudices and passion not inherently woven into, or necessarily called for by the nature of, the offenses should be countenanced, we mention the fact that defending counsel do take some risk. If they seek to make capital out of asserted failures on the part of the prosecution, they must be prepared to be met by an explanation for the omission. There are numerous authorities to the effect that a prosecutor's reply to arguments of defense may become proper, even though, had the argument not been made, the subject of the reply would have been objectionable. The rule is set out in Ochoa v United States, 167 F 2d 341 (CA9th Cir) (1948), in the following language:

"Appellant next asserts that the prosecutor's closing argument to the jury was prejudicially improper. It is contended that certain of the prosecutor's remarks were without basis, inflammatory, or outside the record. Appellant particularly assails comments made by the prosecutor on the subjects of capital punishment and life imprisonment, on the Government's failure to produce another alientist, and on appellant's possible future conduct. These remarks were directly responsive to assertions relative thereto which were made in the argument of appellant's counsel. Though the argument is to be based upon the evidence or reasonable inference therefrom, it may also include statements in reply to those made by opposing counsel which might otherwise be improper. Rice v. United States, 2 Cir., 35 F. 2d 689, 695; Malone v. United States, 7 Cir., 94 F. 2d 281, 288; Baker v. United States, 8 Cir., 115 F. 2d 533, 544."

There is another reason why counsel for the defense must fail on this first ■ assigned error. We can assume, for the sake of argument, that trial counsel's repetitious remarks about the accused being a liar went somewhat beyond the bounds of fair comment.

We then must determine whether such error requires reversal.

In Dunlop v United States, 165 US 486, 17 S Ct 375, 41 L ed 799, 803 (1897), the court said: "If every remark made by counsel outside of the testimony were grounds for a reversal, comparatively few verdicts would stand." Defense counsel do not dispute that principle, but they assert it does not apply, as this was a flagrant abuse of discretion and the argument improperly inflamed the court members against the accused. The answer to that assertion is that trial defense counsel must have concluded they were not so grossly improper as counsel did not so much as object to any of the remarks. It is a little difficult for us to find misconduct which compels a reversal when it purportedly arises out of an argument which had so little impact on defense counsel that they sat silently by and failed to mention it to the appropriate court-martial official at the time of trial.

In Langford v United States, 178 F 2d 48, 53 (CA9th Cir) (1949), cert den 339 US 938, the court stated: "an accused waives his right to assert such an error on appeal by failure to object at the time the improper remarks are made . . . [citing authorities.]"

The failure to object in the trial arena where the harmful effects, if any, might be ameliorated by prompt instructions from the law officer, normally raises the doctrine of waiver and precludes an accused from asserting a claim of error on appeal. However, that principle is not usually applied if the abuse of discretion is so flagrant as to charge the law officer with a duty to stop the discourse sua sponte. An accused is entitled to a just trial, free of unfair appeals to passions and prejudices, and the law officer must direct the proceedings to that end. But we are unable to see how the prosecution's remarks in this instance could have reached that low level. Not only did they fail to impress counsel present at the time they were made that they were objectionable, but, conceding they are harsh, they are not unsubstantiated by the record. It is to be remembered that

trial counsel has some latitude in his comments and oratorical emphasis may be employed. We find support for that principle in Di Carlo v United States, 6 F2d 364 (CA2d Cir) (1925) where the following rule is expressed:

". . . To shear him [the prosecutor] of all oratorical emphasis, while leaving wide latitude to the defense, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted."

Here the dramatic and oratorical denunciation colored the crime in issue, but the hue was within permissible limits. We are, therefore, convinced that this assignment of error must be overruled.

III

The second question requiring consideration is found in the following question: Did the law officer instruct the court correctly on the quantum of proof required in a charge of false swearing? The instruction over which the parties divide is this:

"I again invite your attention, also, to the discussion of false swearing which is paragraph 213 d (4) of the Manual for Courts-Martial beginning on page 386, and also to the cross-reference to paragraph 210 of the Manual with particular attention to the first sentence of the last paragraph of paragraph 210 appearing on page 376.

"We have heard counsel discussing the oath against oath rule, the requirement for corroboration. The rule is that the falsity of the allegedly perjured statement, this of course also includes false swearing, cannot without corroboration by other testimony or by circumstances tending to prove such falsity be proved by the testimony of a single witness.

"In considering the evidence you may, and naturally will, draw reasonable inferences and conclusions from the evidence, whether this evidence be a direct statement of fact,

or circumstances. You may not have direct proof of a fact, but you may have circumstances from which you are able to draw reasonable conclusions and deductions."

Defense argues the instruction was thoroughly inadequate for the kind of corroboration required to support a conviction of false swearing; that the law officer merely pointed out the paragraph in the Manual; and that by paraphrasing only a short part of it, he committed error. When this argument is considered in relationship to the issue granted, it breaks into two parts. First, accused contends that the instruction is erroneous because circumstantial evidence alone is not sufficient to support a conviction of perjury. Second, the assertion is advanced that, assuming circumstantial evidence is sufficient for corroboration, the instruction is incomplete and inadequate.

The Government answers the first part of the argument by saying there is no rule in military law to the effect that circumstantial evidence is not sufficient to corroborate the testimony of one witness, where the allegation is false swearing, citing United States v Gomes, 3 USCMA 232, 11 CMR 232, and we agree. In that case, we approved this quotation taken from State v McGee, 341 Mo 151, 106 SW2d 480 (1937):

". . . The general rule followed in most jurisdictions, and in this State, is well stated in 48 CJ 905, § 173: 'The corroboration may be by circumstantial evidence. The corroborating circumstances need not be proved by direct testimony specifically corrorborating the testimony of the main witness, but may consist of proof of independent facts which together tend to establish the main fact, that is, the falsity of the oath, and which together strongly corroborate the truth of the testimony of the single witness who has testified to such falsity.' See, also, State v. Hunter, 181 Mo 316, loc cit 335, 80 SW 955, loc cit 959, where this court quoted the following with approval: ' "The true principle of the law is this: The evidence must be some-thing more than sufficient to counterbalance the oath of the prisoner and the legal presumption of his innocence. The oath of the opposing witness, therefore, will not avail, unless it be corroborated by other independent circumstances. But it is not precisely accurate to say that these additional circumstances must be tantamount to another witness. The same effect being given to the oath of the prisoner as though it were the oath of a credible witness, the scale of evidence is exactly balanced, and the equilibrium must be destroyed by material and independent circumstances before the party can be convicted. The additional evidence need not be such as, standing by itself, would justify a conviction in a case where the testimony of a single witness would suffice for that purpose; but it must be at least strongly corroborative of the testimony of the accusing witness." ' . . ."

Furthermore, in United States v Walker, 6 USCMA 158, 19 CMR 284, this Court, citing the Manual for Courts-Martial, United States, 1951, paragraph 210, had this to say:

"The Manual's statement of the requirements of proof is consonant with the modern trend that perjury may be proved by circumstantial evidence."

Those holdings answer effectively the first branch of this issue, and so we pass on to consider the second part of accused's argument. It can be disposed of summarily. The paragraph referred to in the Manual by the law officer discusses the elements which must be proven to support a charge of false swearing, all of which were repeated in the instructions given to the court-martial. Additional intructions on circumstantial evidence, intent, presumption of innocence, weight of the evidence, and other required subjects were read. Thus, the law officer gave the finders of fact the necessary elemental and statutory guideposts for their deliberations. We have some difficulty in following counsel's argument, but apparently the incomplete-

ness or inadequacy complained of must arise out of the law officer's failure to instruct on accused's hypothesis. We note a verbal request for an instruction on accused's theory that circumstantial evidence will not suffice for corroboration, but that was denied properly. If it be contended that the instruction was otherwise incomplete and defense counsel desired further amplifying or clarifying instructions, he had a duty to make a request. In United States v Johnson, 3 USCMA 447, 454, 13 CMR 3, this Court said:

". . . If the accused himself had any doubt as to the law officer's meaning, it was his duty to request clarifying instructions, United States v. Long, 2 USCMA 45, 6 CMR 45, decided October 17, 1952; United States v. Jenkins, 1 USCMA 329, 3 CMR 63, decided April 21, 1952. Of course, if the instruction was erroneous or misleading, defense counsel's failure to object would not necessarily be fatal, but certainly the accused's own evaluation of the instruction at the trial level may be considered in weighing its significance on appeal."

Our holding that the instruction states properly the quantum of proof required by military law in this type of case requires us to find for the Government on this assignment of error.

IV

Before taking up the remaining assignments of error, we believe it advisable to restate certain principles of law governing the province of the court-martial and the board of review, and our power to review their findings. Both of those military bodies were delegated fact finding powers, but in granting powers to this Court, Congress limited us to matters of law. Without getting into an academic dissertation on an appellate court's power to weigh facts for insufficiency as a matter of law—a question which is considered in each subsequent section—we call attention to the following principles which have been previously adopted by us. The court-martial in the first instance has the duty of determining the credibility of the witness; the weight and sufficiency of the evidence, reasonable doubt as to guilt; the inferences to be drawn from the proven facts; the interest or bias of witnesses; and, in the final analysis, where the truth lies. The board of review has somewhat comparable powers, but it is admonished by the Code to give consideration to the fact that the court-martial saw and heard the witnesses. Accordingly, its powers are not quite so broad as the trial forum. However, when the case reaches us, we merely measure the evidence to the extent of determining whether it is sufficient as a matter of law to support the findings. In this particular instance, a great deal of appellant's argument is no more than a supplication to us to overlook those principles and substitute our judgment for that of the triers of fact. By way of illustrations, he would have us determine whether the accused or those who challenged his testimony were telling the truth; he entreats us to reject some of the Government's evidence as inherently improbable because it is disputed by other testimony; and he importunes us to disbelieve witnesses because he asserts they were biased. All of those matters should have been and were presented to the triers of fact, but they may not properly be urged before this Court. Therefore, his arguments in those areas are in vain, and we proceed to ascertain if the findings are, as a matter of law, sustainable.

V

Accused next contends that the evidence on all specifications is insufficient in that the Government failed to prove an intent to "willfully and corruptly" testify falsely. The definition of the crime is set out in Article 107 of the Uniform Code, and counsel's assertion is just another way of saying that the evidence on the elements of "knowledge of the falsity" and "intent to deceive," required by that Article, is inadequate to support the findings. The contention must be rejected because the evidence, both direct and circumstantial, so adds up in quantity and quality as to be sufficient to permit the court to find the necessary elements beyond a reasonable

doubt. Usually, the intent of a person cannot be proven by direct and positive evidence. It is a question of fact to be proven, like any other fact, by acts, conduct, and circumstances.

Here the accused was enmeshed in irregular dealings in Government property and money. His operations were being scrutinized officially, and he knew not the degree to which the Government would pursue the investigation. He was determined to obstruct the inquiry, and if he could conceal the extent of his participation he would reduce the chances that he would be the subject of any punitive measures. True it is that he contends he had no motive to falsify because he had accepted responsibilty, but, assuming that to be the case, the full picture is not developed, as his acceptance of accountability was far from being total and complete. The investigation had for its purpose not only the fixing of guilt, if any, but also a complete probing of the method of operation and the extent of the irregularities. Most certainly, the accused could intend to deceive if he falsified to throw the investigator off the scent before he had completed his mission. Several witnesses furnished evidence that accused's statements were in conflict with the true situation, and when that is considered with the inferences which we have shown can be drawn from other testimony, it is readily ascertainable that the court-martial was supplied with a substantial base to infer that accused knowingly falsified with intent to deceive.

The accused seeks to buttress his claim on this facet of insufficiency of evidence by contending that there is inconsistency in the court's finding of not guilty as to specification 4 and guilty as to specification 5. Since both specifications involve statements to the effect that accused did not contact the German firms regarding substitutions, his counsel reasons that they are fatally at variance. Assuming they are inconsistent, a finding of not guilty on the fourth specification is not tantamount to a finding that accused was not guilty of the offense alleged in the fifth specification, because the court had found

he lacked knowledge of the falsity and intent to deceive. It is not beyond the realm of probability to conclude that the members of the court could have acted gratuitously in voting not guilty as to specification 4. In Dunn v United States, 284 US 390, 393, 52 S Ct 189, 76 L ed 356, 358, 359 (1932), the Supreme Court said:

"Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment . . . As was said in Steckler v. United States (C. C. A. 2d) 7 F. (2d) 59, 60:

'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' "

Furthermore, when closely analyzed, the findings are not inconsistent because a separate false statement was set out in each specification. The gist of specification 4 was accused's statement that he did not remember if he had contacted the German firms relative to the substitutions. In specification 5, he is charged with having denied that he had contacted the firms concerning the substitutions, but having asserted that Mr. Blaauw had. If the finders of fact concluded to reason closely, they could have believed him when he said he did not remember, and yet have concluded that he falsified when he later categorically denied making the contacts. The findings can be reconciled on that theory, if need be, because accused either remembered or he did not remember. If he did not honestly remember, he could not truthfully deny that he contacted the German firms.

VI

The next issue involves the question of whether the evidence is sufficient, in law, to support a finding that accused falsified when, in answer to a question, he

138

stated: "I could not direct that the substitutions be made, because I don't know what was on those lists." If the court-martial members believed the Government witness, and the findings establish they did, the evidence is ample. As we interpret the record, the accused's response was clearly proven to be false. Mr. Blaauw and Lieutenant Heatherly stated under oath that they were directed by the accused to arrange for the substitutions. The former further stated that, prior to the preparation of the lists, accused told him to substitute for expendable supplies such items as machine shop tools, measuring instruments, tool grinders, lightning arresters, and other items. Lieutenant Heatherly testified that he showed the list prepared by Mr. Blaauw to the accused, who told him to join with Mr. Blaauw and contact the German suppliers. Witnesses produced by the defense contradicted the prosecution witness, but that is of no serious moment, for any dispute between the witnesses merely created a conflict for the court-martial to resolve, and the resultant question of credibility was decided adversely to the accused. While accused complains that the Government witnesses were biased and prejudiced against him, that, too, was decided by the court below. When those matters are cast aside, the testimony of the two men is clearly sufficient to show the accused testified falsely when he denied knowledge of what was on the lists.

## VII

The next granted issue also involves the sufficiency of the evidence. In this assignment, accused contends the record does not support the finding that accused made a false statement when asked about whom he had advised of their rights as possible codefendants or witnesses and he unresponsively replied: "I did not tell them to conceal anything."

Mr. Blaauw testified that accused told him to tell the inspector general that they (accused and Blaauw) had only asked for prices of the substituted items and that the items had been delivered by mistake. This was a studied attempt to get the witness to conceal the original plan. Lieutenant Rubin stated that accused told him not to identify the lists and "that silence is golden." There again is a statement to conceal essential information. The testimony of these witnesses shows the falsity of the quoted statement set forth in the preceeding paragraph. While counsel for the accused would have us determine the evidence should not be believed because it is inherently improbable, we find no basis for that assertion. The triers of fact were in the best position to determine which witnesses were telling the truth, and they elected to believe the Government witnesses we have mentioned. Their testimony is mutually corroborative, and it is sufficient to show the accused falsified when he stated under oath that he did not tell them to conceal any information.

## VIII

Lastly, left for consideration is another question concerning the sufficiency of the evidence to support the third charge of false swearing. The specification alleged the accused falsified when he denied he contacted any of the German firms relative to the substitutions involved in the irregular procurement procedure. The precise question and answer were these: "Did you ever contact any of the German firms relative to substitutions of these items?" "I didn't, but Mr. Blaauw most certainly did."

It appears to us that accused is seeking to have us forsake substance to play on words. The inspector general, as indicated by his line of questioning, was obviously referring to a business connection when he used the word "contact." The latter part of the answer indicates the accused did not misunderstand the question. To support the allegation of falsity, the Government produced a Mr. Schulenburg, a representative of one of the German firms, who testified that he spoke to accused on two occasions about the nonexpendable items to be substituted. The first was during a courtesy call, and the other call was made to clear up the question of the delivery of the items. Mr. Werch-

mann, a representative of another German firm, testified he also had discussed this irregular procurement procedure with accused. Mr. Blaauw corroborated Mr. Schulenburg's testimony relating to the discussion about substitutions which the latter had with accused. It is no answer to say, as does the accused, that he did not take the first step to initiate the meeting, and, therefore, the answer is not false for the reason that the other parties contacted him, he did not contact them. That is placing an unusual and unrealistic meaning on the term. Here, when considered in context, the word was used in the ordinary sense, and asked whether the accused had been in touch with any of the firms. While the answer is characterized by accused as being merely evasive, we believe the court-martial could find reasonably that it went further and amounted to a prevarication.

### IX

In connection with all of the various issues, we have not overlooked accused's fervent plea that his ac- tions in demanding a court- martial trial prove his innocence. Undoubtedly, that act smacks of an honest belief in his cause, but it does not compel a reversal of the findings. At the time of his demand, he was aware of the fact that he must pit his credibility against that of his subordinates. Sometimes an individual fails to evaluate his own conduct as others might consider it. Sometimes he overestimates his power to persuade others that he has been the victim of intrigue by his associates. Sometimes he takes a calculated risk and loses. We, of course, cannot know with certainty the mental processes which caused the accused to demand what turned out to be his own conviction, but we do know he was given a fair trial.

While we might have reached a different conclusion had we been members of the court-martial, we now must view the evidence under different conditions. In United States v Strong, 1 USCMA 627, 637, 5 CMR 55, we said:

". . . It is universally recognized that the weight of the evidence and the credibility of witnesses is a matter for the triers of fact to determine. See Manual for Courts-Martial, United States, 1951, paragraph 74a."

Our examination of the record reveals the court-martial determined the issues under proper instructional guidance and without substantial error. We must, therefore, affirm the decision of the board of review. It is so ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

The majority make much of the fact that this Court cannot reweigh the evidence or determine the credibility of witnesses who contradict each other. This limitation on our power of review, however, does not preclude us from determining that a witness' testimony is inherently unbelieveable. United States v Mardis, 6 USCMA 624, 20 CMR 340; United States v Chinn, 6 USCMA 327, 20 CMR 43. Moreover, it is our responsibility under the Uniform Code of Military Justice to examine the evidence and determine whether it is sufficient to establish the accused's guilt beyond a reasonable doubt. United States v Johnson, 6 USCMA 20, 19 CMR 146; United States v Covert, 6 USCMA 48, 19 CMR 174. In my opinion, the evidence concerning all specifications, except one, does not meet that standard.

The accused was the Signal Officer of the Rhine Military Post (later the Western Area Command). In September 1952, he was informed by the Signal Supply Agency at Frankfurt, Germany, that there would be available approximately 100,000 Deutsche Marks for the purchase of expendable signal supplies. Allocations from the fund had to be made by mid-October. The accused's organization was not in need of expendables, but it had a substantial shortage in nonexpendable items, such as tools and installation equipment. The latter could not be obtained without considerable administrative difficulty. As a result, the accused decided to use some of the funds for the purchase of nonexpendable items.

To accomplish his purpose the ac-

cused directed Mr. Gerald Blaauw, a civilian engineer in his office, to prepare a list of nonexpendable supplies needed by the unit. Prices for these items were obtained from the three German firms that normally supplied the unit. These were Siemens & Halske, Mix & Genest, and Telefonbrau & Normalzeit. A second group of lists of expendable items was then prepared. These latter lists were padded to include items of a total cost equal to the cost of the articles on the nonexpendable lists. Procurement requests for the expendables were then transmitted to the Signal Supply Agency, which in turn issued the necessary requisition orders to the German suppliers (hereinafter described as 6 GAs). The German suppliers were to disregard the unnecessary additions to the official 6 GAs, and substitute nonexpendables from a separate list provided by Blaauw. The ultimate effect of this arrangement, therefore, would be that the accused's organization would obtain nonexpendable items which were needed instead of expendable materials which were not needed. No profit, other than normal profit the suppliers would make on a regular sale, was to be made on the transaction. No extra payments or gratuities were to be given to the accused or his subordinates.

About a week after a partial delivery by one of the suppliers, the improper procurement was discovered by auditors conducting a routine audit of the accused's organization. An investigation by an inspector general was ordered. This was followed by a second investigation by an inspector general from the United States Army Europe. Eventually, Brigadier General Hughes, Commanding General, Western Area Command, informed the accused by letter that he proposed to discipline him under Article 15, Uniform Code of Military Justice 50 USC § 571. The basis for the proposed action was that the accused was "wrongfully attempting to circumvent procurement regulations in order to obtain tools and equipment for [his] unit; that in the course of the investigation following the above mentioned acts [he] made several false and evasive answers, under oath, to the

Inspector General of this Command, etc." In a lengthy reply to General Hughes' letter the accused admitted responsibility for attempting to circumvent the procurement regulations. He denied the other allegations but he did not specifically request trial by court-martial. This reply was returned for a more unqualified answer. Thereupon, the accused indicated that he did not demand trial by court-martial, and the Commanding General imposed punishment under Article 15. He ordered that the accused forfeit $200.00 of his pay and that he be reprimanded. At the same time, the accused was informed of his right to appeal. See Article 15(d), Uniform Code, supra.

Instead of appealing, the accused requested a court of inquiry into the allegations of false and evasive answers, and asked that pending a determination by the court of inquiry he be permitted to defer payment of the fine. This request was returned to the accused with the direction that he specifically indicate whether he wanted to appeal. Continued correspondence between the accused and the Commanding General of the Western Area Command resulted in treating the accused's endorsements as an appeal from the imposition of punishment. Consequently the case was reviewed by Lieutenant General Bolte, Commanding General, United States Army Europe. On his review he deleted the word "false" from the allegations of wrongdoing and otherwise affirmed the action. The accused protested the propriety of General Bolte's review and insisted upon a court of inquiry. Apparently his persistence led finally to the prosecution of charges against him.

The accused was charged with wrongfully instructing a civilian subordinate, Gerald Blaauw, to solicit false testimony under oath and with four specifications alleging that he lied under oath in the investigations conducted by the inspectors general, all in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was acquitted on the first charge and of one specification alleging that he lied.

The first question on this appeal is whether the evidence is sufficient to sup-

port the findings of guilty of the remaining specifications. For convenience, specification 5 can be considered before the others. At the close of the prosecution's case, the law officer granted a motion for a finding of not guilty; however, he was overruled by the court members. In my opinion the law officer's ruling should have been sustained.

Specification 5, in substance, alleges that the accused lied in an investigation conducted by Colonel J. E. Bush, Assistant Inspector General, United States Army Europe. The question asked and the accused's answer is as follows:

"Q: Did you ever contact any of the German firms relative to the substitutions of these items?

A: I didn't, but Mr. Blaauw most certainly did."

The critical fact in this specification is the meaning of the word "contact." According to the dictionary, "contact" can be used as a noun, in which case it means merely "being in touch physically or mentally"; or it can be used as a verb, particularly in American colloquial speech, in which case it means "to establish a business or social connection." Webster's New International Dictionary, 2d ed, pages 573–574. Although Colonel Bush was called as a prosecution witness he was not asked what meaning he intended. In my opinion, the form of the question clearly indicates that the word was used as a transitive verb.

When used as a noun, "contact" is followed by the word "with" as in the dictionary example, " the *contact* of Rome with Greek thought." Ibid., page 573. When used as a verb, "contact" normally appears in the same form as in the question asked by Colonel Bush. In any event, if the meaning of "contact" is ambiguous, the accused testified that he understood it as a verb. At the trial he was questioned by a court member as to his understanding of the word. His testimony is as follows:

"Q Colonel Doctor, if I were to ask you to contact someone in another city, what would that mean to you?

A To me it would mean that I would either go to them, I would call them by telephone, or other means.

. . . . .

Q Colonel Doctor, if a representative of a company were to come into your office to discuss how his company would get paid for certain items, would you consider that you were contacting the firm in such a discussion?

A No, Sir, I would not."

This testimony is competent for the purpose of showing the accused's understanding of Colonel Bush's question. In United States v Mitchell, 6 USCMA 579, 20 CMR 295, this Court held that when "the language of a communication lacks specificity of meaning, extrinsic evidence is admissible for the purpose of clarification." On that point the accused's testimony is unimpeached and uncontradicted. Therefore, the evidence to support the finding of guilty of this charge must show that the accused himself communicated with the German suppliers in regard to the substitution of nonexpendable items for expendables.

Not a scintilla of evidence shows that the accused established a connection with the German contractors in regard to the substitution. The only evidence of a connection between the accused and the suppliers is to the effect that after the plan was presented to them by Blaauw, some of them on their own initiative called at the accused's office to discuss the matter. In substance, they "contacted" the accused; he did not "contact" them. According to the evidence, therefore, the accused's answer to Colonel Bush was entirely truthful. I would set aside the finding of guilty of specification 5.

The second finding of guilty which, in my opinion, is not supported by the evidence, is that of specification 3. This specification alleges that the accused lied to Lieutenant Colonel Stout, the Inspector General, Western Area Command, when he stated under oath that "I did not tell them to conceal anything." Standing alone the quoted statement is misleading. It is appropriate, therefore, to put the alleged

142

false statement into the context of the whole answer given by the accused and in relation to his answers to a series of questions by Colonel Stout. They are as follows:

"Q: Have you talked to any person prior to his reporting to this office for interrogation?

A: Yes.

. . . . .

Q: Did you advise anybody not to make any statement?

A: I advised them to talk to a counsel. I gave them personal advice that if they were implicated not to make a statement that would incriminate them. I believe that that is my duty.

. . . . .

Q: The investigation of an inspector general is to develop facts.

A: Yes. It is also a privileged communication up to a point where it can be used in a court against a person.

Q: That is correct.

A: Were these persons advised? No, they were not advised it could be used against them in a court.

Q: What persons were not advised?

A: Any persons that were asked by an inspector general. The inspector general advises them of their rights under the 31st Article. Does not tell him at the time that they might possibly be included.

. . . . .

Q: I believe that every person that has appeared before us, Colonel Doctor, has been fully advised of their rights as required by law.

A: I further advised them of their rights.

Q: Did you ever tell any of them that they should not make any statements?

A: I advised them not to make any statement which would incriminate them without discussing the thing, on advice of counsel.

Q: Who did you advise?

A: I advised, I believe, Lt. Rubin, Mr. Blaauw, Lt. Heatherly, Captain Fuller, and Major Greene. I did not tell them to conceal anything, but I did tell them, I advised them of their rights and possibility of self-incrimination, and advised each one strongly to obtain the advice of counsel, which is their right, and no one can deny it to them, not even an inspector general.

Q: Did you ask any of them to remain silent on certain points of the investigation?

A: I advised them, as I said, I refer you to my previous statement, not to make any statement, or I advised them to be cognizant of their rights under the 31st Article of War, to obtain advice of counsel and to guide themselves thereby."

Again the crux of the problem is the meaning of a word. In this case the word is "conceal." It can mean simply a withholding of information or an improper secrecy. Webster's New International Dictionary, 2d ed. In the context of the accused's whole answer and in relation to the other questions and answers, the accused plainly used the word to convey the idea of a deliberate lie, or other improper secrecy, which would hamper or frustrate the investigation by Colonel Stout. To construe the word in a different sense would make the accused's answer patently absurd. In one breath he would be denying not only what he had unqualifiedly admitted in a series of answers, but in the very next breath and in the very same sentence he would be contradicting his denial. On the other hand, if the word "conceal" is construed to mean an improper withholding of information, the answer is internally harmonious and entirely consistent with all the accused's answers on the same subject. As the late Judge Brosman aptly pointed out in United States v Padilla, 1 USCMA 603, 607, 5 CMR 31:

"It is familiar learning that the meaning of a writing must be arrived at by ascertaining the intent of its author, if possible. . . . Effort must be made to effectuate its purpose and to avoid rendering it absurd. . . . Where alternative interpretations are possible, the more reasonable should be chosen."

Consequently, the truth or falsity of the

accused's answers must be determined on the basis of whether, in addition to telling certain persons not to incriminate themselves, the accused also told them to lie or to deny knowledge of information which would not incriminate them but would obstruct the investigation.

Five persons were named by the accused as persons whom he had advised not to incriminate themselves in the inspector general's investigation. These were Lt. Rubin, Mr. Blaauw, Lt. Heatherly, Captain (later Major) Fuller and Major Greene. All testified at the trial either directly or by deposition. Major Greene, who was the Assistant Signal Officer, Western Area Command, specifically denied that the accused told him how he should testify or that he should "conceal any knowledge" that he might have regarding the circumstances. Major Fuller was the accused's Supply Officer. He was in the hospital when the substitution program was initiated, but shortly after his return to the unit in November 1952, he was advised of it by the accused. This was at least several weeks before the auditors noted the discrepancy between the 6 GAs and the receipts of nonexpendable items. His testimony is as follows:

"Q Now, did Colonel Doctor, at any time, after you had been apprised of this plan of irregular procurement tell you or instruct you to lie about this affair?
A No.
Q Never did?
A No.
Q And that was after you knew all about it?
A Yes.
Q Never did at any time? He never told you to lie?
A (The witness shook his head in a negative manner).

. . . . .

Q You testified on cross-examination that you had no instruction to lie, is that correct?
A I believe it is.
Q What do you call instructions to prepare what are in fact false certifications?

A That second question as far as the lie, I believe I was at least thinking of the fact of the investigation of the IG and not to the making of the issue slips; I had never been told to lie to the IG."

Lt. Heatherly was the accused's wire officer. He testified on the basis of written interrogatories. None of the questions asked him relate to this subject. Thus if there is any evidence to support the finding of guilty of specification 3 it must be found in the testimony of Lt. Rubin and Mr. Blaauw.

Lt. Rubin was a civilian at the time he testified in connection with this case. He had been Acting Supply Officer during Major Fuller's period of hospitalization. He was informed of the procurement program by the accused and he prepared the necessary requisition orders for the expendable items which were submitted to the Signal Supply Office. When the plan had been ended and the matter was being investigated he was called to testify before Colonel Stout. This was on February 19, 1953. The accused requested Lt. Rubin to see him before he testified. It is undisputed that in response to that request Lt. Rubin appeared at a court-martial trial at which the accused was serving as a member of the court. During a recess the accused joined Lt. Rubin at the back of the courtroom. What transpired at that point is in dispute.

Lt. Rubin testified that he and the accused left the court-martial room and went to an adjoining room. There they talked for a period of about five to ten minutes. The accused unqualifiedly denied that he left the courtroom with Lt. Rubin or that he had the conversation testified to by Lt. Rubin. The accused's version of this meeting is substantially corroborated by Captain R. W. Kennedy, a member of the Judge Advocate General's Corps and the defense attorney at the trial, and Captain W. C. Hamner, the accused at the trial. The essence of their testimony is contained in the statement by Captain Hamner as follows:

"When the court recessed, as I recall, Colonel Doctor came down from the stand and walked around, it would

be to my left, this Lieutenant Rubin was sitting behind me, sort of, and started talking to the Lieutenant. At about the same time Captain Kennedy left the defense table and walked over and joined the conversation."

Moreover it appears that sometime in March 1953 Lt. Rubin told Mr. Otto Koester, a court interpreter with the Judge Advocate General's office of the Western Area Command that he considered the accused a "no good ——" and that when "this thing came up for trial he would be the most important witness of the case and . . . then . . . he would 'stick him' but good." Major Greene testified that he had been Lt. Rubin's rating officer and that he didn't know whether he would believe Rubin under oath because Rubin was "quite immature and certainly not . . . qualified to be an officer in the United States Army."

In view of the independent evidence I would be inclined to say that Lt. Rubin's testimony would not support a finding of guilty of specification 3 beyond a reasonable doubt. However, I need not consider the value of his testimony for that purpose. Assuming that Lt. Rubin's version of his meeting and conversation with the accused could have been believed by the court-martial, what does it show?

Purportedly, the accused told Rubin that in his opinion Lt. Rubin was "involved in a conspiracy" and that he was "in hot water." According to Lt. Rubin, the accused further advised him that he "should not give any information, but, instead, stand on my rights under the 31st Article of War. He said that, in particular, Colonel Stout would show me some typewritten lists. These lists, he said, were dynamite, and I should be very careful not to identify the lists, and I think, in conclusion, he smiled and said, 'This is a case where silence is golden.'" According to Lt. Rubin in the first part of his testimony before Colonel Stout he was "extremely cautious" about identifying the lists of substitute nonexpendables. He emphatically maintained, however, that his initial hesitation was "not concealment. He was giving him [the accused] the

benefit of every slightest doubt in my mind." Lt. Rubin's own understanding of the accused's advice to him is succinctly summed up in his testimony before Colonel Stout. This testimony was given shortly after Lt. Rubin left the accused.

"Q: Lt Rubin, I am required by regulations to assure myself that you are acquainted with your rights as a witness.

A: I have been reminded of my rights by Colonel Doctor.

. . . . . .

Q: When you first came in here, Lt Rubin, you stated that you had been advised of your rights under the 31st Article of the Uniform Code of Military Justice by Colonel Doctor. What did you mean by that?

A: He asked to see me this morning before I came here and he told me, or he hinted that I might be implicated in this thing and I was to play it cool and that I should say nothing. He at one point said, 'This is a case where silence is golden'.

Q: Then he advised you that you should say nothing to any questions that I might ask you?

A: He advised me to stand on my rights under the 31st Article because he said I might be implicated.

Q: And he actually told you to stand on your rights under the 31st Article of the Uniform Code of Military Justice?

A: Yes sir.

Q: Did Colonel Doctor ask to see you after you had completed your testimony with me?

A: No sir."

The evidence therefore shows that the accused's statement to Colonel Stout regarding his advice to Lt. Rubin is literally true. Hence if the finding of guilty of specification 3 is to be sustained, the evidence to support it must be found in the testimony of Mr. Blaauw.

Gerald Blaauw was employed by the accused in June 1952 as a maintenance engineer. At the accused's direction he prepared the separate lists for nonexpendable items which were to be

**145**

substituted for the expendables on the 6 GAs. Blaauw delivered these lists to the German firms and carried on almost all of the negotiations with them. His testimony has substantial inconsistencies and it is materially contradicted by that of other witnesses. Insofar as these inconsistencies and contradictions are concerned, it need only be noted here that Blaauw testified that after the procurement irregularity was found, the accused directed him to call the German suppliers and to "tell them that in case it came to an investigation we hadn't asked for delivery but just for prices of the equipment." In his second sworn statement to Colonel Stout, Blaauw said that he "relayed" the message to the suppliers. Mr. E. Weichman of the firm of Seimens & Halske, Mr. O. Muller of Mix & Genest, and Mr. H. Schulenburg, of Telefonbrau & Normalzeit, all of whom had received the nonexpendable lists from Blaauw and had carried on negotiations in the matter with him, specifically denied receiving any such request or information from Blaauw or from anyone else. Mr. K. Loenholdt, a subordinate of Mr. Schulenburg's, testified that he received a telephone call from Blaauw some time between Christmas and the New Year. Blaauw had been trying for several months to obtain a position with that firm. As far as Loenholdt could recall the conversation, *"he [Blaauw] was of the opinion* that we should no longer maintain the documents which were the cause of this delivery." (Emphasis supplied.) Loenholdt regarded the suggestion as "very insignificant." That the court-martial disbelieved Blaauw's testimony in this regard is evident from the fact that they acquitted the accused of specification 1 which charged him with instructing Blaauw to solicit false testimony.

Of course, the maxim *falsus in uno, falsus in omnibus,* did not obligate the court-martial to disregard all of Blaauw's testimony, but the court's finding on specification 1 does make it necessary to examine with special care Blaauw's testimony in regard to specification 3. Under the Manual for Courts-Martial, United States, 1951, the falsity of an "allegedly perjured state-

ment cannot, without corroboration by other testimony or by circumstances tending to prove such falsity" be proved by the testimony of a single witness. Paragraph 210. In United States v Gomes, 3 USCMA 232, 11 CMR 232, this Court unanimously applied the requirement of corroboration to a prosecution for an alleged false statement to a Federal Bureau of Investigation agent investigating the official conduct of the accused. We there said (page 239):

"The Manual for Courts-Martial, United States, 1951, . . . assimilates the requirements of proof of perjury to the offense of false swearing. Manual for Courts-Martial, United States, 1951, paragraph 213*d* (4), page 387. On that basis falsity cannot be proved by the testimony of a single witness without corroboration by other testimony or by circumstances tending to prove such falsity."

From the evidence it appears that the accused asked Blaauw to see him before he kept his appointment with Colonel Stout. According to the accused, after the auditors had discovered the irregularity in the procurement, he went to Colonel Ely, the Deputy Commander of the Western Area Command and acknowledged responsibility for the program. Having done that he did not want his subordinates inadvertently and unnecessarily to get into trouble. He told Blaauw "not [to] sign anything" until he had an opportunity to talk to counsel and if he then "desired or decided to sign . . . he was to tell the truth." Blaauw, however, gave a different version of that conversation.

Blaauw testified that before he appeared before Colonel Stout the accused told him to destroy all papers that he had pertaining to the procurement and, accordingly, he burned them. Although Blaauw testified on three separate occasions before Colonel Stout, with two of those appearances being at his own request, and once before Colonel Bush and again before Colonel Johnson, the Article 32 Investigation Officer, and although on each occasion he was asked in substance whether he had any other

146

information on the matter, he admitted that the "first time [he] ever mentioned it [the direction to destroy the papers] was at the trial." At the Article 32 investigation, he was asked the following questions and he gave the following answers:

"Q. As far as you know did Col Doctor ever tell you to conceal anything?
A. No.
Q. Before or during the time that you testified before the IG? What I am getting at, this was no secret?
A. This procurement, no. Everybody knew about it.
Q. He didn't tell you to conceal anything about the substitution, did he?
A. No."

Blaauw also testified that the accused told him that when questioned by Colonel Stout he was "not to say that we asked for delivery but just asked for prices and these firms apparently had delivered by mistake." and that he "didn't know from anything." Oddly enough, however, Blaauw admitted that before his conversation with the accused had ended, the accused told him to "go and tell the truth." There is substantial evidence from which it can be concluded that Blaauw's testimony represents his personal distortion of the accused's advice. This distortion was induced by his assumption that the accused was trying to "pin" responsibility upon him. Thus he admitted that he gave the following answers to questions asked by Colonel Johnson, the pretrial investigating officer.

"Q. And I believe in reading that later testimony of yours a person would be inclined to think or believe that Col Doctor had instructed you as how to testify before an IG.
A. That could be interpreted so, as you will also see in my first testimony, oh no . . . excuse me, that he told me 'Well, go in there and tell the truth.'
Q. In other words you would state then at this time that you do not feel that Col Doctor tried to influence your testimony.
A. No, not actually."

However, I need not elaborate upon these circumstances. In view of all the inconsistencies in Blaauw's testimony, "standing alone . . . [it] is of very doubtful weight." United States v Archibald, 5 USCMA 578, 579, 18 CMR 202. Blaauw's testimony is substantially contradicted in related parts by other prosecution witnesses; it is entirely unsupported by independent corroborative evidence in regard to specification 3; and it is flatly contradicted by the accused. Considered as a whole, therefore, the evidence falls far short of showing guilt beyond a reasonable doubt. Consequently, I would also set aside the finding of guilty of specification 3.

The final specification of which the accused was convicted alleges that he lied when he told Colonel Stout that he "could not direct that the substitution be made, because I don't know what was on those lists." Again setting out the statement without the matter to which it relates presents an incomplete picture. In pertinent part the investigation proceeded as follows:

"Q: Do you know anything about the substitution of nonexpendable items for expendable items after you received the 6GA?
A: At this time I believe I should furnish you a sworn statement covering my knowledge of the transaction. (Statement was given to the investigating officer.) I will sign that in your presence.
Q: Do you wish to submit this statement as a sworn statement?
A: I do. I will sign it. If you wish to ask me any further questions, if I believe they are not incriminating, I will be glad to answer them. You understand my position as a supervisor, I believe.
Q: I will repeat that question, Colonel Doctor. (Question 553 read back). [First question above.]
A: I decline to answer in accordance with the provisions of Art. 31 of the Uniform Code of Military Justice, in view of the fact that I have possibly learned some things during my formal investigation.

⋆ ⋆ ⋆ ⋆ ⋆ ⋆

**147**

Q: . . . I will give you the copy of this 6 GA. (Copy of 6GA was handed to witness)

A: I have never seen the 6GA.

Q: Will you look at the second slip in there, the one where the items were to be deleted. Have you knowledge of that? The next page. That is the page I am referring to.

A: I have never seen this list.

Q: Are you familiar with any of the items?

A: I know we need stepladders. I don't know anything about the items.

Q: These were items to be deleted. You don't know anything about them?

A: I think that as long as we are pursuing that course I can say I have never seen that 6GA. I don't know what you mean by 'items to be deleted'.

Q: . . . In the course of this investigation, Colonel Doctor, it has been alleged that you personally directed that certain non-expendable items be substituted for expendable items that were requested on these 6GA's that I have in my possession. That is contrary to USAREUR Circular 75 and also puts the firms concerned in the position of being apt to have any further procurement through them rejected. It has been alleged that you personally directed that the substitutions be made.

A: I could not direct that the substitution be made, because I don't what was on those lists."

The accused testified that he did not know the specific items that were on the 6 GAs and the separate nonexpendable lists. The independent evidence substantially supports him and does not indicate the contrary. The items on the lists were selected by Lt. Heatherly and Mr. Blaauw. The actual nonexpendable lists were prepared by Blaauw and the 6 GAs were typed by Lt. Rubin. Blaauw testified that he did not think that the accused ever saw the nonexpendable lists. Similarly Rubin testified that the accused told him about the several lists but he "did not go into detail as to the particular items that would be on the list." Major Fuller said that the accused told him about the arrangement but as far as

148

he knew the accused did not know the exact items on the lists. At the trial the accused maintained that although his statement to Colonel Stout was "evasive" it was literally true. His testimony on that point is as follows:

"Q Did you just say you had directed Mr. Blaauw to make this substitution?

A Yes, sir.

Q But in your answer to Colonel Stout you said, 'I could not direct that the substitutions be made'.

A That question I'll concede was evasive, it was meant to be evasive. It was in answer to Colonel Stout's question in which he said, 'Did you direct the certain non-expendables be substituted for expendables' and as I didn't know what the certain non-expendables were, I could not direct that particular transaction in the manner that Colonel Stout indicated.

. . . . . .

Q Before you answered the question, didn't you have a right to ask for clarification of that question before you made or might incriminate yourself?

A Frankly I didn't. The way Colonel Stout was conducting his investigation, I didn't think he was going to give me any rights."

Assuming that the accused did not know the specific items on each list, the evidence clearly shows that he knew that the 6 GAs contained expendable items and that the separate lists set out the nonexpendables. There is also no doubt that the accused instructed his subordinates to arrange for the substitution. In fact, in his own testimony, the accused admitted that he gave these instructions. It is also evident that notwithstanding his earlier conversation with Colonel Ely regarding the procurement, the accused was not going to admit to Colonel Stout greater responsibility than was implied in his "position as a supervisor." The accused's reluctance to do more than that may have been due to his fear that Colonel Stout "was not going to conduct the investigation fairly." Whatever the accused's reason, however, his attitude toward Colonel Stout clearly led him

to say more than he intended to say at the beginning of the questioning. The statement that he "could not direct that the substitution be made" was more than merely "evasive"; it was definitely untrue. Consequently I concur in affirming the findings of guilty of specification 2.

In view of my conclusions regarding the sufficiency of the evidence, I need not consider the other assignments of error. The accused's testimonial admissions as to the part he played in the transaction remove any possibility of harm that could have resulted from trial counsel's argument, and the inadequacy of the law officer's instruction on the requirement for independent corroborative evidence. United States v Jackson, 4 USCMA 294, 15 CMR 294; United States v Hatchett, 2 USCMA 482, 9 CMR 112.

Left for consideration is the question of the propriety of the sentence. In my opinion two of the three charges upon which the original sentence was based are unsupported by the evidence. Undeniably, dismissal from the service is a legal sentence for the remaining specification. However, the circumstances of the offense indicate that the accused was probably foolish rather than deliberately false. He is an officer with 28 years of reserve and active duty.

In that period of time he rose from private to colonel. He earned the Legion of Merit, the Bronze Star and the French Croix de Guerre with Palm. In fact, his trial by court-martial would probably never have eventuated had he not permitted exaggerated and distorted emotions to control his reason.

In the original evaluation of the accused's wrongdoing, the Commanding General of the Western Area Command and the Commanding General of United States Army Europe determined that the accused should be punished by a reprimand and a $200.00 fine. It is also noteworthy that Colonel H. A. Johnson, the Article 32 investigating officer, concluded his report by saying: "Trial by courts martial is not recommended." Under all the circumstances therefore, I believe that "the interests of justice will be best served by permitting a primary rather than a 'secondary and derivative' redetermination of the sentence." United States v Voorhees, 4 USCMA 509, 531, 16 CMR 83. Accordingly, I would set aside the sentence and return the case to a court-martial for reconsideration of an appropriate sentence. United States v McBride, 6 USCMA 430, 20 CMR 146. At the rehearing, I would allow the accused to raise the question of former punishment. In my opinion, there is a substantial issue as to whether Article 15 (e), Uniform Code of Military Justice, 50 USC § 571, applies in this case.